Merrimack
No. 83-027

THE STATE OF NEW HAMPSHIRE

v.

. PHILIP J. BENOIT

February 6, 1985

8

*Gregory H. Smith*, attorney general (*Andrew L. Isaac*, assistant attorney general, on the brief and orally), for the State.

*Joanne S. Green*, assistant appellate defender, of Concord, by brief and orally, for the defendant.

DOUGLAS, J. The principal question raised in this appeal is whether the superior court erred in its determination that the fifteen-year-old defendant, Philip Benoit, had voluntarily, knowingly

and intelligently waived his privilege against self-incrimination before making an incriminating statement to the police. In addition, we are asked to determine whether the superior court erred in ruling that defense counsel's questioning of a State's witness concerning her inability to identify the defendant on the day of the alleged offense would "open the door" to inquiry into a previously excluded line-up identification. We reverse and remand.

I. *Facts*

On May 27, 1982, a loaded .44 magnum revolver and a .22 caliber revolver were stolen from under the front seat of Paul Gagnon's truck, which was parked on Thorndike Street in Concord. One day later, an armed robbery occurred at the Food Basket Store, also located in Concord. The defendant became the principal suspect in the two crimes.

On the evening of May 28, the defendant was at a party in Pittsfield. Sometime that night, the Pittsfield police arrived at the party to arrest the defendant, but he managed to elude them and escape. Approximately one hour later, the police went to the apartment of Tammie Recce in Epsom, after being notified that Philip had taken refuge there. When the police confronted the defendant at the Recce apartment, Philip ran through the apartment, crashed through a glass door, escaped onto the roof, and jumped to the ground some fifteen or twenty feet below. He then wrestled with the arresting officer.

At the time of the arrest, Philip was bleeding profusely. He was taken to Concord Hospital by a rescue squad, where he was treated for lacerations of his hands and head that resulted from his crash into the glass door. Sometime later, he was transferred to the Concord police station, where he remained overnight.

Officer Cross of the Concord police testified that, at approximately 9:00 a.m. the following morning, he went to the child's cell with the purpose of obtaining a statement. Just he and Philip were present at the meeting. The officer informed the defendant that he wished to discuss the armed robbery of the prior day. The officer testified that Philip agreed to talk, so they moved to an interview room.

Officer Cross testified that once in the interview room, he reminded Philip of his rights, as required under both the State and Federal Constitutions, by reading one sentence at a time from the Concord Police Department's standard form used for adults. *See State v. Nash*, 119 N.H. 728, 730–31, 407 A.2d 365, 367 (1979); *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). The officer testified that he made no attempt to explain any of the rights, but

merely asked the child if he understood them, to which Philip replied "yes." During the one-hour interrogation, the defendant made a statement in which he incriminated himself in the armed robbery and the theft of the firearms.

At the time of the interrogation, the child had been in police custody for approximately nine hours. During that time, the police had made no effort to contact his parents, a lawyer, or any adult interested in his welfare. The officer further testified that he did not discuss with the defendant any of the possible legal consequences of a confession to, or a conviction for, the felony of armed robbery.

Philip was fifteen years old, and had spent much of his life in various foster homes, group homes, and residential treatment facilities under the authority of the State. Although he is of average intelligence, he has completed only an eighth-grade education, which puts him approximately two years behind his peers.

Marsha Flynn, the Chief Probation Officer at the Concord District Court, testified that she had had contact with Philip in regard to his life-long family neglect situation, as well as to six prior delinquency proceedings. She testified that, although he had been read his *Miranda* rights on numerous occasions, on each such occasion he was *in court* in the *presence of a judge* and represented by *counsel.*

The unrebutted testimony of Dr. Durand, a psychiatrist, was that Philip may have sufficient intelligence to understand the substance of the privilege against self-incrimination. Dr. Durand was *certain*, however, that Philip does not have the capacity to exercise the informed and independent judgment required in order to knowingly and intelligently relinquish that right.

Dr. Durand's opinion was partly based on his belief that Philip is impulsive, lacks common sense, and exercises poor judgment in the day-to-day management of his conduct. More important to the doctor's determination, however, was his belief that although Philip may have known that judicial proceedings could result in incarceration, his frame of reference was limited to incarceration in State programs which he had known all his life, such as the Youth Development Center (YDC). In effect, the doctor was certain that Philip would have recalled the immediate consequences of his prior situations and would *not* have understood the consequences of being certified as an adult and possibly being sentenced to the State prison. Thus, the doctor concluded that Philip would not be in a position to exercise informed and independent judgment in waiving his constitutional rights.

On June 30, 1982, the child was certified to stand trial as an adult, pursuant to RSA 169-B:24 (Supp. 1983) by order of the Concord Dis-

trict Court (*Robbins*, J.). He subsequently was indicted for the felonies of armed robbery, RSA 636:1, II(a), and theft, RSA 637:3, I.

Prior to trial, Philip moved to suppress the incriminating statement made by him in response to police questioning. Based upon the above-described facts, he argued that the totality of the circumstances did not show a voluntary, knowing and intelligent waiver of his privilege against self-incrimination as well as of his right to counsel, and that his statement should be excluded because it was obtained in the absence of an adult who was interested in his welfare.

After a hearing, the Superior Court (*DiClerico*, J.) denied the motion to suppress. The court declined to rule that a juvenile could not waive his rights without the advice of counsel and held that it would continue to use the totality of the circumstances test in determining whether a *juvenile* has made a voluntary, knowing and intelligent waiver. The court then concluded that the State had proved beyond a reasonable doubt that Philip had voluntarily, knowingly and intelligently waived his privilege against self-incrimination and his right to counsel.

After a jury trial in Superior Court (*DiClerico*, J.), Philip was convicted of theft of a firearm and armed robbery. He has been sentenced to the New Hampshire State Prison for four to ten years for armed robbery and one to three years for theft, to be served concurrently. This appeal followed.

## II. *Treatment of Juveniles Under New Hampshire Law*

This State long has recognized the common-sense fact that a child does not possess the discretion and experience of an adult, *Porter v. Wilson*, 106 N.H. 270, 271, 209 A.2d 730, 731 (1965), and that special procedures are required to protect juveniles, who possess immature judgment. *State v. Lemelin*, 101 N.H. 404, 406, 144 A.2d 916, 918 (1958).

In recognition that children often act imprudently and lack the capacity to understand the full consequences of their acts, the law of this State provides that juveniles may disaffirm a contract upon reaching majority, *Porter v. Wilson, supra* at 271, 209 A.2d at 732, may not marry without parental and judicial consent, RSA 457:5 to :7, and may not purchase alcoholic beverages, RSA 175:5 (Supp. 1983). *See also* RSA 464-A:42 (court must approve settlement made on behalf of minor); RSA 31:43-c (Supp. 1983) (cities and towns may adopt curfews prohibiting persons under the age of sixteen in public places or streets after nine o'clock unless accompanied by a parent or guardian); RSA 571-C:1 (Supp. 1983) (persons under the age of

seventeen may not donate blood); RSA 287-E:7, III (Supp. 1983) (persons under the age of eighteen may not attend bingo games).

More importantly, the legislature, in recognition of the inherent differences between children and adults, has provided for special treatment of juveniles under the juvenile justice statute. RSA ch. 169-B (Supp. 1983). The juvenile justice system differs both in philosophy and procedure from the adult penal system, and this court has recently reaffirmed that the *purpose* of the juvenile justice system is *not penal*, but *protective. State v. Smith*, 124 N.H. 509, 512, 474 A.2d 987, 989 (1984).

RSA chapter 169-B provides that the district courts shall have exclusive jurisdiction over any person under the age of eighteen who is charged with the commission of an offense which would be a felony or a misdemeanor, if committed by an adult. RSA 169-B:2, II, :3, :4 (Supp. 1983). RSA chapter 169-B was enacted as part of a "comprehensive juvenile justice system that has as its primary concern the welfare of the child." *In re Eric C.*, 124 N.H. 222, 224, 469 A.2d 1305, 1306 (1983).

"The primary purpose of the Legislature [in enacting RSA chapter 169-B] was to shield children under eighteen from the environment surrounding adult offenders and inherent in the ordinary criminal processes. As an incident to the accomplishment of this purpose, proceedings involving children under eighteen are so conducted as to *prevent attachment* of the '*stigma* of a criminal' by reason of conduct resulting from *immature judgment." State v. Lemelin*, 101 N.H. 404, 406, 144 A.2d 916, 918 (1958) (quoting *United States v. Fotto*, 103 F. Supp. 430, 431 (S.D.N.Y. 1952)) (emphasis added).

The legislature has provided various procedures to effectuate the purposes and objectives of RSA chapter 169-B (Supp. 1983). For example, under RSA 169-B:10 (Supp. 1983), a juvenile who has been taken into custody may be released to a parent or guardian without court referral. If a case is referred to the district court and the court finds that the minor is delinquent, the court may order the least restrictive of the alternatives set out in RSA 169-B:19 (Supp. 1983). The alternative dispositions range from releasing the child to the parent, RSA 169-B:19, I(a) (Supp. 1983), to committing the child to the youth development center, RSA 169-B:19, I(i) (Supp. 1983).

It is difficult to ascertain the total number of children taken into custody by law enforcement agencies in a given year. District court figures indicate that, in 1983, 5,097 delinquency petitions were disposed of in the district courts. Obviously, not all juveniles taken into custody are formally referred to juvenile court, and, thus, this figure does not reflect the total number of juveniles detained. For example,

the figure does not include the 2,398 juvenile cases handled outside the court structure through formal juvenile diversion programs last year. These diversion programs provide community assistance and support to adolescents in finding constructive solutions to their problems. Further, neither figure includes the cases informally diverted from the juvenile court system by police talking to parents and not pursuing any formal paperwork.

Under RSA chapter 169-B (Supp. 1983), if the offense allegedly committed by a child would be a felony if committed by an adult, the district court may conduct a hearing to determine whether the case should be transferred to the superior court. RSA 169-B:24 (Supp. 1983). If the case is transferred, or "certified," the superior court may then treat the accused minor as an adult. RSA 169-B:24 (Supp. 1983). In *State v. Smagula*, 117 N.H. 663, 377 A.2d 608 (1977), annual figures were cited reflecting that of 4,510 delinquency petitions formally filed in 1976 (a smaller number than total police-juvenile interaction), only 63 led to transfer for trial as adults. *Id.* at 665, 377 A.2d at 609.

III. *Capacity of Juveniles To Understand and Waive Rights*

The capacity of juveniles to understand their privilege against self-incrimination and their right to counsel and, consequently, to knowingly and intelligently waive those rights has been the subject of numerous empirical studies. *See, e.g.*, Grisso, *Juveniles' Capacities to Waive Miranda Rights: An Empirical Analysis*, 68 CALIF. L. REV. 1134 (1980); Grisso & Pomiciter, *Interrogation of Juveniles: An Empirical Study of Procedures, Safeguards and Rights Waiver*, 1 L. & HUM. BEHAV. 321 (1977); Ferguson & Douglas, *A Study of Juvenile Waiver*, 7 SAN DIEGO L. REV. 39 (1970); Lefstein, Stapleton & Teitelbaum, *In Search of Juvenile Justice: Gault and Its Implementation*, 3 L. & SOC'Y REV. 491 (1969). These studies have concluded that, due to their immaturity, many children are incapable of exercising informed judgment concerning the substance and significance of waiving their constitutional rights and that, hence, certain procedural safeguards should be employed to insure that waivers by children are genuinely knowing, intelligent and voluntary.

One empirical study, which sought to determine the capacity of juveniles to comprehend the meaning and significance of their *Miranda* rights, concluded that juveniles younger than fifteen years old typically did not adequately comprehend their *Miranda* rights and that one-third to one-half of fifteen-year-olds manifested inadequate understanding of the *Miranda* warnings. Grisso, *supra* at 1160. The study further found that 55.3 percent of the children demonstrated an inadequate understanding of at least one of the four warn-

ings, *id.* at 1153–54, and that 63.3 percent of the juveniles misunderstood at least one of the crucial words used in the standard *Miranda* warnings, *id.* at 1154. Adequate understanding of the warnings was achieved by only 20.9 percent of the juveniles. *Id.* at 1153.

A juvenile's failure to comprehend fully the substance and significance of his or her rights may be attributed, in part, to an inability to understand the rights as set out in standard *Miranda* warnings. A more explanatory form may aid juveniles in understanding their rights. *See generally* Ferguson & Douglas *supra* (younger juveniles and juveniles less experienced with respect to law enforcement practices respond positively to simplified form); Lefstein, Stapleton & Teitelbaum, *supra* at 505–11 (manner in which juveniles are advised of rights is often inadequate, as the standard form is insufficient).

## IV. *Juvenile Confessions: The Tests*

The defendant argues that part I, article 15 of the New Hampshire Constitution requires that a juvenile in all cases be afforded the opportunity to have present and consult with an informed adult interested in his welfare before he can be deemed to have waived his constitutional rights. The State, however, urges this court to follow the United States Supreme Court and to use the totality of the circumstances test to decide the admissibility of a juvenile's confession made with or without the counsel of an interested adult. *See Fare v. Michael C.,* 442 U.S. 707 (1979).

The New Hampshire Constitution guarantees a criminal defendant protection from involuntary self-incrimination. Pursuant to part I, article 15, "[n]o subject shall be . . . compelled to accuse or furnish evidence against himself." N.H. CONST. pt. I, art. 15. Accordingly, before statements made by a defendant during custodial interrogation may be considered as evidence, the State must prove beyond a reasonable doubt, *State v. Phinney,* 117 N.H. 145, 147, 370 A.2d 1153, 1154 (1977), that the defendant was warned of his constitutional rights, *see State v. Nash,* 119 N.H. 728, 730–31, 407 A.2d 365, 367 (1979), that the defendant waived those rights, *State v. Butler,* 117 N.H. 888, 891, 379 A.2d 827, 829 (1977), and that the statements were made voluntarily, knowingly and intelligently, *State v. Berube,* 123 N.H. 771, 774, 465 A.2d 509, 511–12 (1983).

Under the traditional test employed to determine whether an accused has waived the privilege against self-incrimination and the right to counsel, " '[i]t must be shown that there was an intentional relinquishment or abandonment of a known right or privilege.' " *State v. Nash, supra* at 732, 407 A.2d at 368 (quoting *Johnson v.*

*Zerbst*, 304 U.S. 458, 464 (1938)). Whether àn *adult* voluntarily, knowingly and intelligently waived his rights is ultimately determined from the totality of the circumstances. *See State v. Bushey*, 122 N.H. 995, 999, 453 A.2d 1265, 1267 (1982).

The circumstances under which children can be deemed to have voluntarily, knowingly and intelligently waived their privilege against self-incrimination and right to counsel have been the subject of much debate. Scholars, courts and legislators have recognized that a child's immaturity and inexperience place him or her at a greater disadvantage than an adult in dealing with the police. Two approaches have been advanced as appropriate to determine the validity of a juvenile's waiver.

The majority of jurisdictions rely on the totality of the circumstances test in deciding whether statements by a juvenile were given voluntarily, knowingly and intelligently. *E.g., Fare v. Michael C.*, 442 U.S. 707 (1979); *West v. United States*, 399 F.2d 467 (5th Cir. 1968), *cert. denied*, 393 U.S. 1102 (1969); *United States v. Fowler*, 476 F.2d 1091 (7th Cir. 1973); *People v. Lara*, 67 Cal. 2d 365, 432 P.2d 202, 62 Cal. Rptr. 586, *cert. denied*, 392 U.S. 945 (1967); *Interest of Stiff*, 32 Ill. App. 3d 971, 336 N.E.2d 619 (1975); *State v. Ann Marie C.*, 407 A.2d 715 (Me. 1979); *Commonwealth v. Cain*, 361 Mass. 224, 279 N.E.2d 706 (1972); *Commonwealth v. Williams*, 475 A.2d 1283 (Pa. 1984) (overruling the "interested adult rule").

Courts employing the totality of the circumstances test do so under the belief that juvenile courts are equipped with the expertise and experience to make competent evaluations of the special circumstances surrounding the waiver of rights by juveniles. Under the totality approach, no single factor is controlling; rather, the courts look to all the circumstances surrounding the giving of the statement. Factors to be considered when weighing the determination would be matters such as the following: (1) the chronological age of the juvenile; (2) the apparent mental age of the juvenile; (3) the educational level of the juvenile; (4) the juvenile's physical condition; (5) the juvenile's previous dealings with the police or court appearances; (6) the extent of the explanation of rights; (7) the language of the warnings given; (8) the methods of interrogation; (9) the length of interrogation; (10) the length of time the juvenile was in custody; (11) whether the juvenile was held incommunicado; (12) whether the juvenile was afforded the opportunity to consult with an adult; (13) the juvenile's understanding of the offense charged; (14) whether the juvenile was warned of possible transfer to adult court; and (15) whether the juvenile later repudiated the statement.

Under the "interested adult" rule urged by the instant defendant, no juvenile can be deemed to have voluntarily, knowingly and in-

telligently waived his privilege against self-incrimination and his right to counsel without first being provided the opportunity to consult with, and have present at interrogation, an adult who is informed of the juvenile's rights and is interested in the juvenile's welfare. This rule has been adopted by a minority of jurisdictions. *See, e.g., Lewis v. State*, 259 Ind. 431, 288 N.E.2d 138 (1972); *State in Interest of Dino*, 359 So.2d 586 (La.), *cert. denied*, 439 U.S. 1047 (1978); *In re K. W. B.*, 500 S.W.2d 275 (Mo. 1973); *In re E. T. C.*, 141 Vt. 375, 449 A.2d 937 (1982); *State ex rel. J. M. v. Taylor*, 276 S.E.2d 199 (W. Va. 1981); *see also* COLO. REV. STAT. § 19-2-102(3)(c)(I) (Supp. 1983); CONN. GEN. STAT. ANN. § 46b-137(a) (West Supp. 1984).

The courts that have adopted the "interested adult" rule have done so to afford protection to juveniles, whom they characterize as disadvantaged by the immaturity occasioned by their youth. The rationale underlying this *per se* rule is that the immaturity of the juvenile significantly affects both the ability of the juvenile to understand fully his or her rights and the susceptibility of the juvenile to the compelling atmosphere of police interrogation, and that special protections are thus required to protect the juvenile from incompetently waiving his or her rights. It is believed that the interested adult can remedy the shortcomings resulting from immaturity by providing advice to enhance the juvenile's understanding of his or her rights and by being present during custodial interrogation to protect the child from the compelling atmosphere of custodial interrogation.

## V. *The Required Warning For Teenagers*

In determining what procedures are required under part I, article 15 of the New Hampshire Constitution in juvenile confession cases, we have considered parts II and III above, concerning the treatment of juveniles under New Hampshire law and the ability of a juvenile to understand the substance and significance of his or her rights.

A *per se* approach would require mandating interested adult presence in *every* case in which a child whom the police seek to question is taken into custody. Law enforcement agencies would have to adhere to this requirement in every case, without regard to the likely manner of disposition of the case. Adopting such an approach would result in onerous financial and administrative burdens which are unwarranted, given the protective and rehabilitative philosophy of the juvenile justice system.

More importantly, the *per se* rule requiring adult presence could, in effect, chill the rehabilitative function of the juvenile justice system by restricting the flexibility of action under the statute. The role of the juvenile justice system is to assure sound disposition

of juvenile cases and to rehabilitate the youth. Requiring procedures which treat every child as a criminal could actually prompt court referral and prevent the use of alternative rehabilitative dispositions which are more likely to discourage future criminal behavior. Generally speaking, the *per se* rule is simply not a pragmatic solution, given the large number and variety of juvenile cases. Moreover, we cannot conclude that the State Constitution requires such a rule.

A judge should be free to consider the validity of a confession in light of the totality of the circumstances, as set forth under the discussion of that test above. There is no reason to believe that a judge will not properly evaluate all of the above enumerated factors. Under the totality of circumstances approach, a judge may exercise discretion in examining the full range of considerations surrounding a child's waiver. Furthermore, under such an approach there will be minimal interference with police investigations. To assure, however, that the greatest care is taken in evaluating juvenile waivers, a court must review and make findings on each of the factors set out above. *See State v. Smagula*, 117 N.H. 663, 667–68, 377 A.2d 608, 611 (1977); *see also State v. Gullick*, 118 N.H. 912, 915, 396 A.2d 554, 556 (1978).

■■■ Under New Hampshire law, "[t]he requirement of a knowing and intelligent waiver implies a rational choice based upon some appreciation of the consequences of the decision." *State v. Bushey*, 122 N.H. 995, 999, 453 A.2d 1265, 1267 (1982). In *State v. Phinney*, 117 N.H. 145, 147, 370 A.2d 1153, 1154 (1977), this court reaffirmed the unique evidentiary nature of a confession. *See State v. Howard*, 17 N.H. 171, 181–86 (1845). We noted that "[i]ts acceptance basically amounts to a conviction." *State v. Phinney*, *supra* at 147, 370 A.2d at 1154. In view of the risks involved when a confession is to be admitted against a child in adult *criminal* court, we are persuaded that for a judge to conclude that the statements were made knowingly and intelligently, the child, when facing a charge that would be a felony if committed by an adult, must have been advised of the possibility of his being tried as an adult and of his being subject to adult criminal sanctions.

As explained in part II of this opinion, this State has established numerous protective mechanisms for the juvenile accused. *See* RSA ch. 169-B (Supp. 1983). In addition, under RSA 628:1, "a person less than fifteen years old is not criminally responsible for his conduct, but may be adjudged delinquent."

Many juveniles are aware of the special mechanisms of the juvenile justice system. A child, in making a statement, may reasonably

believe that the statement will be used only in the protective and rehabilitative setting of juvenile court. The lack of knowledge on the part of a child concerning the possibility of felony criminal treatment of his offense cannot be allowed to induce the giving of a statement. Hence, to insure a truly knowing and intelligent waiver of the privilege against self-incrimination, the child must be advised of the possibility of prosecution in superior court as an adult.

Our conclusion, which is in accord with the law of several other States, is that for juveniles accused of what for an adult would be a felony to knowingly and intelligently waive their rights, they must be aware of the possibility of criminal prosecution for the offense charged. *Cf. State v. Loyd*, 297 Minn. 442, 212 N.W.2d 671 (1973) (juvenile must be aware that he might be tried as an adult, but his awareness may come from the adversary character and setting of interrogation); *In Interest of A. D. R.*, 515 S.W.2d 438 (Mo. 1974) (same); *Quiriconi v. State*, 96 Nev. 766, 616 P.2d 1111 (1980) (same); *State v. Gullings*, 244 Or. 173, 416 P.2d 311 (1966) (same); *State v. Lohnes*, 324 N.W.2d 409 (S.D. 1982), *cert. denied*, 459 U.S. 1226 (1983) (juvenile must be given notice that he might be tried as an adult); *State v. Luoma*, 88 Wash. 2d 28, 558 P.2d 756 (1977) (juvenile should be informed of the possibility of adult trial, but awareness may be imputed to the juvenile on the basis of the adversary character and setting of interrogation); *Theriault v. State*, 66 Wis. 2d 33, 223 N.W.2d 850 (1974) (same).

Furthermore, because accused citizens must understand their rights in order to effectuate a valid waiver, the greatest care must be taken to assure that children fully understand the substance and significance of their rights. In part III of this opinion, we examined the possibility that children's understanding of their rights may be aided by the use of simplified *Miranda* warnings. We recommend therefore the use of the simplified juvenile rights form set out in the appendix attached to this opinion if an incriminating statement is offered as evidence in our courts. While we urge law enforcement agencies to use a simplified juvenile *Miranda* form, failure to do so will not, in and of itself, render a juvenile's statements inadmissible. Given the statistics set out in part III of this opinion and the reality of the situation, however, if a juvenile is not given a statement of his or her rights in the simplified fashion, this court will presume, when evaluating the circumstances surrounding the giving of the statement, that the juvenile's explanation of his or her rights was inadequate.

We conclude, therefore, that before a juvenile can be deemed

to have voluntarily, knowingly and intelligently waived his or her fundamental constitutional rights under part I, article 15 of the New Hampshire Constitution, (1) he or she must be informed, in language understandable to a child, of his or her rights, (2) the court must review and make findings on each of the factors enumerated in part IV above surrounding the giving of the statement, (3) the judge and jury, if the confession is admitted, must be persuaded by an adequate number of favorable findings that the waiver was made voluntarily, intelligently and with full knowledge of the consequences, and (4), if facing charges that would constitute a felony if committed by an adult, the juvenile must be informed of the consequences of a certification to stand trial as a criminal defendant.

Of course, in *all* cases, juvenile or criminal, the law requires that the officer in charge of a police station to which an arrested person is brought "*shall immediately* secure" from the arrestee the name of a parent, near relative, friend or attorney with whom the person may desire to consult "and *immediately notify*" such person. RSA 594:15 (emphasis added); *see State v. Beaupre*, 123 N.H. 155, 159, 459 A.2d 233, 236 (1983). Furthermore, the juvenile justice system provides that "if [a] minor is not released within 4 hours of being taken into custody, the court shall be notified, and thereupon, placement, until arraignment, shall be determined by the court." RSA 169-B:11 (Supp. 1983).

Our holding today will not put an end to controversies surrounding a juvenile's waiver of constitutional rights. It will, however, provide concrete procedures for law enforcement officers and courts to follow in the future, which will safeguard children from unknowing and unintelligent waivers of their constitutional rights.

█ In the instant case, the trial court, after "having considered the totality of the circumstances," found "beyond a reasonable doubt that the defendant knowingly, voluntarily and intelligently waived his Miranda rights . . . ." The trial court did not make findings on each of the factors it considered in assessing the admissibility of the juvenile's confession. Moreover, the record established that the interrogating officer read the defendant his rights from the standard adult *Miranda* form. The officer did not explain any of the rights, nor did he discuss with the defendant the possibility of his being tried as an adult for armed robbery. Accordingly, on remand for retrial the confession should be suppressed.

VI. *Ruling on Introduction of Line-up Identification*

The defendant asks us to determine whether the superior court erred in ruling that, if counsel for the defendant questioned the vic-

tim-witness as to her inability to identify the defendant on the day of the alleged offense, counsel would thereby "open the door" for inquiry into a previously excluded line-up identification.

The record indicates that on May 28, 1982, the same day as the armed robbery, the victim of the armed robbery, Leanne Jackson, failed to identify the defendant as the perpetrator of the crime. The record further indicates, however, that six months later, on November 24, 1982, Jackson identified the defendant in a line-up.

The defendant moved before trial to suppress any testimony regarding the line-up and any in-court identification resulting therefrom, arguing that the line-up violated his constitutional rights in that it was unnecessarily suggestive. On November 28, 1982, the Superior Court (*DiClerico*, J.) granted the defendant's motion to suppress.

At trial, counsel for the defendant sought to question Jackson concerning her inability to identify the defendant on May 28, 1982. Defense counsel asked the court for a ruling, in the nature of a motion *in limine*, that, if he questioned Jackson regarding her mis-identification of May 28, 1982, he would not open the door for inquiry into the November 24, 1982, line-up identification which had been suppressed. The court ruled that "if you inquire into one specific area, the matter is then opened up and it would be unfair to preclude the State on redirect examination from inquiring into other identifications." Defense counsel excepted to the court's ruling and chose not to question Jackson about the May 28, 1982, mis-identification.

■■ The doctrine of "opening the door," or "curative admissibility," "allows a trial judge, in his discretion, to admit otherwise inadmissible evidence in order to rebut prejudicial evidence which has already been erroneously admitted. The doctrine applies, therefore, only when inadmissible evidence has been allowed, when that evidence was prejudicial, and when the proffered testimony would counter that prejudice." *United States v. Nardi*, 633 F.2d 972, 977 (1st Cir. 1980) (citations omitted); *see also* 1 WIGMORE, EVIDENCE § 15 (Tillers rev. 1983); C. MCCORMICK, HANDBOOK OF THE LAW OF EVIDENCE § 57 (2d ed. 1972); 1 WEINSTEIN'S EVIDENCE ¶ 103[02] (1982).

■ "The rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." *United States v. Lum*, 466 F. Supp. 328, 334 (D.C. Del.), *aff'd*, 605

F.2d 1198 (3d Cir. 1979); *see United States v. Winston*, 447 F.2d 1236, 1240–41 (D.C. Cir. 1971).

The record indicates that the State, during its direct examination of Jackson, questioned her regarding her physical description of the perpetrator of the crime. During cross-examination, defense counsel sought to inquire into the mis-identification to "show that [Jackson's] ability to perceive negative descriptions is not accurate." In other words, the defendant sought to impeach Jackson's credibility. There is nothing in the record indicating that the proffered testimony regarding Jackson's mis-identification was inadmissible at trial. Hence, we conclude that the doctrine of curative admissibility is inapplicable.

New Hampshire courts, however, have expanded the meaning of the phrase "opening the door." "In practice today, the same term is often used more broadly to describe situations in which a misleading advantage may be countered with previously suppressed or otherwise inadmissible evidence." *State v. Crosman*, 125 N.H. 527, 531, 484 A.2d 1095, 1098 (1984). There was, however, no *misleading* advantage present in the case before us.

Defense counsel sought to question Jackson as to her inability to identify the defendant on the day of the alleged offense. The record indicates that Jackson was, in fact, unable to identify the defendant on that date. As stated above, this was a proper matter for inquiry. Had the State been permitted to elicit testimony regarding the line-up, it would have left the jury with the impression that the witness could positively identify the defendant despite the fact that the identification had been deemed unnecessarily suggestive and therefore unreliable. The fact that the door has been opened does not, by itself, permit all evidence to pass through. "The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice." *United States v. Winston*, 477 F.2d 1236, 1240 (D.C. Cir. 1971). We conclude, therefore, that the court erred in ruling that the defendant would open the door for inquiry as to the previously excluded line-up identification if he questioned Jackson as to her mis-identification on May 28, 1982.

An accused has the right under part I, article 15 of the New Hampshire Constitution "to produce all proofs that may be favorable to himself; to meet the witnesses against him face to face, and to be fully heard in his defense . . . ." This constitutional provision encompasses the fundamental right to cross-examine witnesses to impeach their credibility. *State v. LaClair*, 121 N.H. 743, 745, 433 A.2d 1326, 1328 (1981). It is equally clear that the defendant's right

to due process of law protects him from the introduction of evidence of an identification ruled unreliable because it resulted from an unnecessarily suggestive line-up procedure. *See State v. Monteiro*, 110 N.H. 95, 98–99, 261 A.2d 269, 271–72 (1970).

█ In effect, the trial court's ruling forced the defendant to relinquish his fundamental right to cross-examination in order to protect his right to due process of law. "To require a person to surrender one constitutional right in order to gain the benefit of another is simply intolerable." *Opinion of the Justices*, 121 N.H. 531, 540, 431 A.2d 144, 151 (1981).

*Reversed and remanded.*

BROCK, J., concurred specially; the others concurred.

BROCK, J., concurring specially: I interpret the majority opinion as holding that confessions of juveniles between the ages of 15 and 18 are inadmissible in felony criminal proceedings later brought against the juvenile unless the juvenile was first ". . . advised of the possibility of his being tried as an adult and of his being subject to adult criminal proceedings."

Because I concur in this holding and, on the record before us, believe it alone to be dispositive of the present case, I concur narrowly and specially in the result reached.

## APPENDIX

### Juvenile Rights Form

Child in Custody ————————————————————————
Place ————————————————————————————————
Date ———————————— Time child taken into custody ——————————
Time this form was read ————————————————————————————
(The following is to be read and explained by the officer, and the child shall read it before signing.)

Before I am allowed to ask you any questions, you must understand that you have certain rights, or protections, that have been given to you by law. These rights make sure that you will be treated fairly. You will not be punished for deciding to use these rights. I will read your rights and explain them to you. You may ask questions as we go along so that you can fully understand what your rights are. Do you understand me so far? Yes ——— No ———.

1. You have the right to remain silent. This means that you do not have to say or write anything. You do not have to talk to anyone or answer any questions we ask you and you will not be

punished for deciding not to talk to us. Do you understand this right? Yes ____ No ____.

2. Anything you say can and will be used against you in a court. This means that if you do say or write anything, what you say or write will be used in a court to prove what you may have done. Do you understand this? Yes ____ No ____.

3. You have the right to talk to a lawyer before any questioning. You have the right to have the lawyer with you while you are being questioned. The lawyer will help you decide what you should do or say. The things you say to the lawyer cannot be used in court to prove what you may have done. If you decide you want a lawyer, we will not question you until you have been allowed to talk to the lawyer. Do you understand this right? Yes ____ No ____.

4. If you want to talk to a lawyer and you cannot afford one, we will get you a lawyer at no cost to you before any questioning begins. This means that if you want a lawyer and you cannot pay for one, you still may have one. Do you understand this right? Yes ____ No ____.

5. You can refuse to answer any or all questions at any time. You also can ask to have a lawyer with you at any time. This means that if you decide, at any time during questioning, that you do not want to talk, you may tell us to stop and you cannot be asked any more questions. Also, if you decide you would like to talk to a lawyer at any time during questioning, you will not be asked any more questions until a lawyer is with you. Do you understand this right? Yes ____ No ____.

6. (In felony cases only) There is a possibility that you may not be brought to juvenile court but instead will be treated as an adult in criminal court where you could go to a county jail or the State prison. If you are treated as an adult for doing what you may have done, you will have to go through the adult criminal system just as if you were 18 years old. You will not receive the protections of the juvenile justice system. Do you understand this? Yes ____ No ____.

7. Do you have any questions so far? Yes ____ No ____.

(This portion is now to be read by the child.)

I can read and understand English. Yes ____ No ____.

I have been read and I have read my rights as listed above. I fully understand what my rights are. I do not want to answer any questions at this time and I would like to have a lawyer.

Signature of child _____ Date _____ Time _____

24

### Waiver of Rights

(This portion is to be read by the child.)

I can read and understand English. Yes ____ No ____.

I have been read and I have read my rights as listed above. I fully understand what my rights are. I have been asked if I have any questions and I do not have any. I am willing to give up my right to silence and answer questions. I give up my right to have a lawyer present and I do not wish to speak to a lawyer before I answer any questions. No promises or threats or offers of deals have been made to me to make me give up my rights. I understand that I may change my mind at any time and say that I want my rights if I choose, but that if I change my mind it will not affect what I have already done or said.

Signature of child _____ Date _____ Time _____

Signature of witness _____ Date _____ Time _____