FILED

October 12, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

**IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE**

FOR PUBLICATION

Filed: _____ October 12, 1998 _____

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| APPELLEE, | ) | SULLIVAN CRIMINAL |
| | ) | |
| v. | ) | Hon. R. Jerry Beck, Judge |
| | ) | |
| NATHAN ALLEN CALLAHAN, | ) | No. 03S01-9711-CC-00136 |
| | ) | |
| APPELLANT. | ) | |

FOR APPELLANT:

STEPHEN M. WALLACE
Blountville

FOR APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

DARIAN B. TAYLOR
Assistant Attorney General
Nashville

# O P I N I O N

AFFIRMED                                                    HOLDER, J.

## OPINION

2

We granted this appeal to decide whether a juvenile can constitutionally waive the right to remain silent when the juvenile has not been informed of the possibility of being prosecuted as an adult. We hold that: (1) neither the Tennessee Constitution nor the United States Constitution requires police officers to inform the defendant that he may be prosecuted as an adult; and (2) juvenile waivers shall be analyzed under a totality-of-the-circumstances test, which requires consideration of factors consistent with those enumerated in Fare v. Michael C., 442 U.S. 707, 724-25 (1979). The decision of the Court of Criminal Appeals affirming the defendant's conviction is affirmed.

## BACKGROUND

On March 30, 1994, the defendant, Nathan Allen Callahan, murdered both his mother and his thirteen-year-old sister in the garage of the Callahan family home. Both victims died as the result of multiple shotgun wounds. The mother sustained close range shotgun blasts to the buttocks, to the back, to the shoulder, and to the head. The defendant shot his sister at close range, once in the buttocks and once in the head. The shotgun blasts to the victims' heads displaced most of the victims' brain matter from their cranial cavities. The defendant was fifteen years old at the time of the murders.

Prior to the murders, the defendant resided with his parents and his sister in their upper-middle-class family home. The defendant indicated that he was never abused and described members of his family as people "who try to do the right thing." The defendant's relationship with his family began to deteriorate when the defendant began abusing drugs. The defendant's father, Glen

2

Callahan, learned of the defendant's drug abuse around January 1, 1994, and attempted to restrict the defendant's activities. The Callahans disciplined the defendant by: selling his 1994 Pontiac Trans Am, restricting his contact with drug-abusing friends, ceasing his allowance, and informing him that he could not obtain a learner's permit until he passed a drug screen and improved his grades.

The defendant continued to test positive on drug screens despite his parents' disciplinary measures. In February of 1994, the defendant's mother traded her car for a 1994 black Camaro. She informed the defendant that he could have the Camaro if he passed two drugs screens. The situation, however, remained relatively unchanged. Approximately two days before the murders, the defendant asked his sister in the presence of a friend, "What would you do if I killed my Mom and Dad?" His sister replied: "Nathan, shut up. That's not nice to say. You shouldn't do that, I would hate you forever if you did." The defendant, however, devised a plan to kill his parents and his grandparents in response to his activities being restricted.

On the day of the murders, the defendant had several lengthy telephone conversations with James Saylor and Jonathan Mann. The defendant discussed his plan with both Saylor and Mann. Saylor offered suggestions as to how the defendant might murder his mother and other members of the Callahan family. Unbeknownst to the defendant, these telephone conversations were recorded.

The first recorded conversation admitted into evidence occurred between the defendant and James Saylor. The defendant informed Saylor that he was "getting ready to go upstairs and get the gun." The defendant discussed the possibility of remaining at the "house for a couple of weeks" after he murdered his parents. He stated that he would kill his father when his father returned

3

home from a business trip and that he would also kill his grandparents. The defendant, however, expressed concern that others would became suspicious if bills were not paid and his parents failed to appear for work. During the second and third conversations with Saylor, the defendant stated that he could not find the pistol and was going to have to use the shotgun. The defendant also expressed concern that he would not be able to sneak up behind the victims with a shotgun.

The defendant went into detail about his devised plan to kill his mother and sister during the third recorded conversation with Saylor. He informed Saylor that his mother and sister "went out to eat." He told Saylor, "Why don't you come over, I'm gonna shoot them as they walk in the door. Come up behind them, and shoot them in the garage so I don't get blood all over the house." The defendant elaborated that he was "going to wait around the corner, you know at the garage, when they walk in, I'm going to come up behind them, pow, pow. (Laughs)." Saylor responded, "Why don't you just push them in the garage, and turn the car on."

The defendant had a subsequent taped phone conversation with Jonathan Mann. He told Mann that "I've got the goddamn gun outside the car, and I'm looking out the blind. As soon as I see that fuckin' car, I'm gonna run out there and wait for them. I'm gonna shoot them in the garage, 'fore they can get in the house." He further told Mann that "I'll go to jail" "if I get caught." The defendant asked Mann, "How many years do you think I'd get? Life?" Mann responded affirmatively. The defendant then called Saylor on a three-way line and again explained his plan. The defendant reiterated that "[w]e gotta kill my grandparents tomorrow." Saylor recommended poisoning the defendant's mother's food. The defendant responded, "No, I'm shooting her ass, bitch."

4

The defendant's mother and sister returned home while the defendant was on the phone. He placed the receiver down, leaving it off the hook so that Saylor could hear the events. He walked outside, retrieved the shotgun, and waited on his mother and sister to open the garage door. The garage door opened, and they entered the garage. The defendant first shot his sister once. He then shot his mother in the shoulder. His sister knelt down on the garage floor. The defendant walked within a few feet of his sister and shot her in the head. The defendant again pointed the shotgun in the direction of his mother and pulled the trigger. The gun was empty. He reloaded the shotgun and shot his mother in the buttocks. He then shot her in the back and in the head. The defendant left the garage and re-entered the house. He picked up the telephone receiver and told Saylor that he had killed his mother and his sister.

The defendant was apprehended by the police approximately four hours after he murdered the victims. He was transported to the sheriff's department. The defendant's father had returned from his business trip and granted the police permission to question the defendant. The defendant was advised of his Miranda rights on several occasions. At the sheriff's department, he was informed:

> You have the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and have him with you during questioning. If you cannot afford to hire a lawyer, one will be appointed before any questioning if you wish one. If you decide to stop answering questions now without a lawyer present, you can stop answering any time you wish.

The defendant read the waiver of rights form and then signed the form. The defendant stated that he understood his rights.

5

The officers testified that the defendant's demeanor was "very calm." He was not crying, shaking, or visibly upset. The defendant did not appear to be under the influence of any substances. A drug screen later confirmed that the defendant was not under the influence of any substances at the time he waived his right to remain silent. The defendant stated that he wished to speak. The officers then read the second part of the Miranda form to the defendant which stated:

> I have read this statement of my rights, and I know what my rights are. I want to make a statement and answer questions. I do not want a lawyer at this time. I understand, and know what I am doing. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

The defendant then reread and signed the form. He stated that he understood what he was signing.

The defendant, after reading, signing, and indicating that he understood both forms, began to speak about the murders. The defendant's lengthy statement was transcribed by an officer. A bathroom break was taken during the statement. The defendant was given a pack of cookies or crackers and a soft drink. The defendant neither requested additional breaks nor complained about the facility's quality. He neither requested an attorney nor indicated that he wished to cease speaking. He never requested to see his father or any family members. Officers testified that the defendant's demeanor was "calm" and "polite" during the statement. The transcribed statement was read to the defendant. The defendant acknowledged that the statement was accurate and signed every page of the statement.

6

The defendant filed a motion to suppress his statement. He asserted that while he "may have understood the literal language" of the Miranda warnings, the officers failed to inform him of the "ramifications" of his waiver. He claimed that the officers should have provided him with an "explanation of the judicial system" and that the police officers should have informed him of the possibility of being prosecuted as an adult.

The trial court denied the defendant's motion to suppress. The trial court held that under the totality of the circumstances the defendant knowingly and voluntarily waived his right to remain silent. The court stated that the waiver forms were "simple [and] straightforward, and perhaps designed to address all levels of education." The court noted that the atmosphere of the interrogation room was calm; that no undue pressure was placed upon the defendant; and that the defendant was calm, clear, and cognizant during the waiver process.

The trial court rejected the defendant's argument that a police officer is under an obligation to inform juveniles of the possibility they may be prosecuted as adults. The court stated that a "police officer could not predict the future." The court found that such a requirement could be dangerous because "anytime the police officer steps over that boundary" and attempts to predict the future, the officer runs the risk of misleading the juvenile.

The defendant raised the suppression/waiver issue at the appellate level. The Court of Criminal Appeals noted that the defendant did not contend that his confession was coerced. The defendant merely argued that his age and the fact that he was not informed that he might later be prosecuted as an adult precluded him from making a knowing and intelligent waiver. The court rejected the defendant's argument and held that under a totality-of-the-circumstances review

7

the defendant's waiver was the result of a free and deliberate choice. The Court of Criminal Appeals affirmed the trial court's denial of the motion to suppress and affirmed the defendant's convictions. Upon review, we affirm.

## ANALYSIS

The defendant argues that both the Fifth Amendment to the United States Constitution and Article I, § 9 of the Tennessee Constitution mandate that a juvenile suspect be informed of the possibility of being prosecuted as an adult before the juvenile can make a knowing, intelligent, and voluntary waiver of the right against self-incrimination. Accordingly, the defendant asks this Court to adopt a per se exclusionary rule barring the use of a juvenile's confession when the juvenile has not been warned of the possibility of being prosecuted as an adult. In the alternative, the defendant argues that if this Court declines to adopt a per se exclusionary rule, this Court should add to the list of factors considered under the totality-of-the-circumstances test the inquiry of whether a juvenile was informed of the possibility of being prosecuted as an adult.[1] The defendant maintains that his confession was unconstitutional even when analyzed under a totality-of-the-circumstances test. We disagree and decline to adopt a per se exclusionary rule.

---

[1]The defendant argues that while the majority of jurisdictions have declined to adopt a per se exclusionary rule, those jurisdictions "hold that the absence of a warning about adult prosecution is at least one factor to be considered in ascertaining the voluntariness of a purported waiver . . ." This is an inaccurate assessment of the status of the law. Most jurisdictions utilizing the totality-of-the-circumstances test have: (1) held that police officers are not required to inform juveniles of the possibility of being prosecuted as adults; and (2) incorporated the Fare factors when analyzing the totality of the circumstances. The Fare factors, listed infra, do not include an inquiry into whether police officials have informed a juvenile of the possibility of being prosecuted as an adult.

8

# PER SE EXCLUSIONARY RULE

The Fifth Amendment to the United States Constitution as applied through the Due Process Clause of Fourteenth Amendment provides that no person shall be compelled in any criminal case to be a witness against himself. The Tennessee Constitution also provides that a defendant cannot be compelled to give evidence against himself. Tenn. Const. art. I, § 9.

An accused may waive the right against self-incrimination. Miranda v. Arizona, 384 U.S. 436, 444 (1966). In Miranda, the United States Supreme Court held that a suspect

> must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. The Court held that a suspect may knowingly and intelligently waive the right against self-incrimination only after being apprised of his or her Miranda rights. Id. Accordingly, a constitutional waiver of the right against self-incrimination requires the accused to make an intelligent, knowing, and voluntary waiver of the rights afforded by Miranda. Id. at 444.

Under federal constitutional law, courts must look to the totality of the circumstances when determining whether an adult has made a knowing, intelligent, and voluntary waiver under Miranda. North Carolina v. Butler, 441 U.S. 369, 373 (1979). The totality-of-the-circumstances test enunciated in Butler was later adopted to analyze cases involving a juvenile's waiver of Miranda rights. In Fare v. Michael C., 442 U.S. 707 (1979), the Court held that a

9

juvenile's request for his probation officer during questioning was not "a *per se* invocation of that juvenile's Fifth Amendment rights under Miranda." Id. at 727-28. The Court concluded that the "totality-of-the-circumstances approach [was] adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." Id. at 724-25. The factors enumerated in Fare for evaluation were: "the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id. at 725.

Tennessee courts have adhered to the federal totality-of-the-circumstances test when examining waivers of Miranda rights. See State v. Benton, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988) (adhering to the totality-of-the-circumstances test as stated in North Carolina v. Butler); see also State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 472 (Tenn. 1993). The defendant, however, urges this Court to replace the totality-of-the-circumstances approach with the per se exclusionary rule adopted by the New Hampshire Supreme Court in State v. Benoit, 490 A.2d 295 (N.H. 1985). In Benoit, the court required that a juvenile be informed of the possibility of a waiver of jurisdiction into an adult court as a constitutional prerequisite to the admission of a police statement.[2] Accordingly, the defendant would have this Court append a new and mandatory warning to the litany of established Miranda rights and warnings.

---

[2]The defendant's brief fails to reflect that State v. Benoit, 490 A.2d 295 (1985), is no longer precedent in New Hampshire. See State v. Dandurant, 567 A.2d 592 (N.H. 1989) (holding the standard Miranda warnings and not the Benoit juvenile warnings applicable to juvenile interrogations).

The underpinnings of <u>Miranda</u> are to dissipate the compulsion inherent in custodial interrogations, to prevent coerced self-incrimination, and to prevent relevant defendant ignorance. <u>Moran v. Burbine</u>, 475 U.S. 412, 425 (1986); <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986); <u>State v. Stephenson</u>, 878 S.W.2d 530, 547 (Tenn. 1994). Neither the United States Constitution nor the Tennessee Constitution mandates that a criminal suspect be apprised of every possible consequence of a <u>Miranda</u> waiver. <u>See</u> <u>generally</u> <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987). Moreover, neither the federal constitution nor the state constitution requires that a police officer admonish a suspect concerning all possible methods of prosecution, modes of punishment, and maximum penalties. Whether a juvenile shall be prosecuted as an adult is a method of prosecution. Methods of prosecution are simply not within the purview of law enforcement officials. Decisions concerning methods of prosecution and modes of punishment are legal decisions within the authority of the district attorneys and the courts. An officer's representation as to either the mode of punishment or the method of prosecution is prophetic and potentially misleading. Accordingly, neither the Tennessee Constitution nor the United States Constitution requires police officers to inform juveniles of the possibility that they may be prosecuted as adults.

## TOTALITY OF THE CIRCUMSTANCES

The defendant argues in the alternative that whether a juvenile is informed of the possibility of being prosecuted as an adult should now be a factor in the totality-of-the-circumstances test. His argument is premised on the assertion "that a juvenile suspect cannot truly be aware of the consequences of waving his constitutional rights without knowledge of [sic] that adult punishment may be imposed." We disagree.

11

Prosecution as an adult is not a consequence of a waiver of <u>Miranda</u> rights. A consequence of a <u>Miranda</u> waiver is "that anything he says can be used against him in a court of law." <u>Miranda</u>, 384 U.S. at 444. Whether a juvenile may be prosecuted as an adult, however, is contingent upon the gravity of the offense and the juvenile's background. <u>See</u> Tenn. Code Ann. § 37-1-134 (noting that juveniles less than sixteen years of age may be prosecuted as an adult for first degree murder and second degree murder). In the case now before us, the defendant was prosecuted as an adult as a consequence of committing a double homicide that included a premeditated and deliberate killing and not as a consequence of waiving his <u>Miranda</u> rights.[3]

We have held that warning a juvenile of the possibility of being prosecuted as an adult is not required for an effective <u>Miranda</u> waiver. Enumerating a warning that is not required as a factor under the totality-of-the-circumstances test is illogical and would in effect mandate the non-required warning. Accordingly, we hold that juvenile waivers shall be analyzed under a totality-of-the-circumstances test that requires consideration of the following factors:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the <u>Miranda</u> warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with <u>Miranda</u> warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;

---

[3]While a waiver may ultimately lead to a conviction, a waiver neither dictates the method of prosecution nor the mode of punishment.

12

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

These factors are sufficiently capacious to encompass coercive tactics such as threatening a juvenile with adult prosecution or promising leniency. While courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity. Colorado v. Connelly, 479 U.S. 157, 167 (1986).

In the case now before us, the defendant does not allege that his waiver was the result of coercion. The defendant was read his Miranda rights on several occasions. The defendant reread his rights and verbally acknowledged that he understood his rights. He signed the Miranda forms. Both the atmosphere of the interrogation and the defendant's demeanor were calm. The defendant was permitted to take a break and was provided a snack and a soft drink. He possessed above-average intelligence and was able to read and write in the language used to convey his Miranda rights. The defendant was not under the influence of any intoxicants at the time of the waiver and did not appear to be suffering from any mental disorders. His demeanor during his statement was calm, polite, and cooperative. Accordingly, we affirm the trial court's finding of a voluntary, knowing, and intelligent waiver.

The judgment of the Court of Criminal Appeals affirming the trial court's judgment is affirmed. Costs of this appeal shall be taxed against the defendant, Nathan Allen Callahan, for which execution may issue if necessary.

13

_____
JANICE M. HOLDER, JUSTICE

**Concurring:**

Anderson, C.J.
Drowota, Birch, and Barker, J.J.