Merrimack
No. 98-497

# THE STATE OF NEW HAMPSHIRE

v.

## JASON FARRELL

January 29, 2001

*Philip T. McLaughlin*, attorney general (*Charles T. Putnam*, senior assistant attorney general, on the brief and orally), for the State.

*Twomey & Sisti Law Offices*, of Chichester (*Paul Twomey* on the brief and orally), for the defendant.

BRODERICK, J. The defendant, Jason Farrell, was certified as an adult at age sixteen, *see In re Farrell*, 142 N.H. 424, 702 A.2d 809 (1997), tried and convicted on one count of second degree murder, and sentenced to twenty-two to forty-four years in the New Hampshire State Prison. *See* RSA 630:1-b, I(b) (1996). On appeal, he argues that the Superior Court (*Smukler*, J.) erred in: (1) denying his motion to suppress statements he made to the police; (2) denying his motion to vacate acceptance of certification and transfer allowing him to be tried as an adult; (3) admitting evidence of prior bad acts without conducting the analysis required by New Hampshire Rule of Evidence 404(b); (4) refusing to allow his expert to disassemble the handgun at trial; (5) refusing his request to repoll the jury; and (6) permitting the prosecutor to encourage the jury to conduct experiments with the handgun during deliberations. The defendant also argues that there was insufficient evidence to find that he acted with extreme indifference to the value of human life. We reverse and remand.

On February 19, 1996, the defendant and his friend, a neighbor, went to a vacant lot in Concord to shoot a handgun that the defendant had taken from his home several days earlier. On their walk back to the friend's apartment, they met the victim, who joined them. Once at the apartment, the defendant's friend loaded two bullets into the handgun, and he and the defendant began "messing around" with it. The defendant apparently decided to play a joke on the victim in an effort to scare him. He asked his friend to count to ten and yell "bang" while he held the gun approximately two feet from the victim's face. He threatened to shoot the victim, saying, "I'm going to bust a cap in you." The victim replied, "Don't point that at me." The defendant allegedly took the gun off safety and again pointed it at the victim's face at close range. He asked his friend to count to ten, but before the count concluded, the gun discharged, critically wounding the victim, who died shortly thereafter.

When Officer Thomas arrived at the scene of the shooting, he was ordered to stay with the defendant. He testified that the juvenile was shaking and repeatedly said, "I didn't mean to do it." Thomas promptly told him not to say anything until he was advised of his

rights. Thomas then drove the defendant to the Concord police station. Once there, Thomas took the defendant to the library, let him sit at a table, removed his handcuffs, and sat across from him.

About thirty minutes later, Detective Gagnon began interrogating the defendant. Gagnon explained the defendant's *Miranda* rights and gave him a copy of the simplified *Miranda* form used for juveniles. He then read each paragraph aloud and solicited the defendant's understanding. He specifically told the defendant that he might be charged as an adult and repeatedly advised him that he had a right to remain silent. Although the defendant exhibited some confusion about his right to counsel, he agreed to give a statement, and he signed the waiver portion of the *Miranda* form. Gagnon then interrogated him about the details of the shooting.

At one point, Gagnon left the room and discussed the defendant's statement with other investigating officers, including Officer Cross. Cross, who had interviewed the defendant's friend, believed there were inconsistencies between the two stories. Gagnon took Cross to the library so Cross could interrogate the defendant. Cross' interrogation was confrontational and accusatory.

The defendant's father, William Farrell, who lived with the defendant, was home, but outside, at the time of the shooting. When informed of the shooting by a neighbor, he immediately approached two uniformed police officers and inquired about his son's whereabouts. They told him that his son had been taken downtown, but furnished no further details. Farrell proceeded to the police station, identified himself as the defendant's father to "the person at the window" and asked to see his son. Approximately ten minutes later, he repeated his request. No officer approached him, however, for fifteen to twenty minutes. While it is unclear exactly when Farrell arrived at the station and requested to see his son, it is clear that at some point his son was interrogated while Farrell waited at the station to consult with him.

At no time during the custody and interrogation of the defendant did the police make any affirmative effort to identify and notify his parents or any other interested adult with whom the defendant may have wished to consult. Further, the defendant was never told that his father was at the station requesting to consult with him. At the conclusion of the juvenile's interrogation, Gagnon located the defendant's father and led him to a room where they discussed what had occurred, including the fact that the victim had died. Finally, the father was taken to the library where his son was waiting. He then informed his son that the victim had expired.

I

Prior to trial, the defendant moved to suppress his statements to the police arguing that they were obtained without a knowing, intelligent, and voluntary waiver of his *Miranda* rights. Specifically, he argued that the State failed to prove that he waived his constitutional rights in conformity with *State v. Benoit*, 126 N.H. 6, 490 A.2d 295 (1985). Ruling that the defendant was appropriately informed of his rights in comprehensible language and "was rational, emotionally composed, and understood the import of the situation and the rights involved," the trial court denied his motion.

On appeal, the defendant argues that his statements were obtained in violation of his right against self-incrimination under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Sixth Amendments to the United States Constitution. Specifically, he alleges that: (1) the police failed to identify and notify his parents immediately as required by RSA 594:15 (1986); (2) he did not fully understand his rights and, thus, could not knowingly and intelligently waive them; (3) the police failed to inform him that a presumption existed that he would be tried as an adult; and (4) his declarations made during Cross' interrogation effectively terminated his interview and required the police to secure a new *Miranda* waiver.

■ Because the Federal Constitution provides no greater protection to the defendant than the State Constitution, we address only the defendant's claims under the State Constitution and look to federal cases for guidance only. *See State v. Ball*, 124 N.H. 226, 231-33, 471 A.2d 347, 351-52 (1983). The New Hampshire Constitution provides that "[n]o subject shall be . . . compelled to accuse or furnish evidence against himself." N.H. CONST. pt. I, art. 15. Accordingly, to overcome the presumption that a defendant would not normally forfeit this constitutional protection, the State must prove beyond a reasonable doubt that a defendant knowingly, intelligently, and voluntarily waived this right. *See State v. Gravel*, 135 N.H. 172, 178, 601 A.2d 678, 681 (1991). We will not reverse a trial court's finding on this issue "unless the manifest weight of the evidence, when viewed in the light most favorable to the State, is to the contrary." *State v. Gagnon*, 139 N.H. 175, 177, 651 A.2d 5, 7 (1994) (quotation omitted).

In *Benoit*, we addressed the capacity of juveniles to understand and waive their rights, concluding that special procedures are needed to protect them. *See Benoit*, 126 N.H. at 18-19, 490 A.2d at 303-04. We declined to adopt a requirement, however, that an

interested adult be present at every custodial interrogation in order for a waiver to be effective, *see id.* at 16-17, 490 A.2d at 302-03, and agreed with the United States Supreme Court that the "totality-of-the-circumstances approach is adequate to determine whether there has been a waiver." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). We adopted a comprehensive, fifteen-factor test for trial courts to use in evaluating a juvenile's purported waiver:

> (1) the chronological age of the juvenile; (2) the apparent mental age of the juvenile; (3) the educational level of the juvenile; (4) the juvenile's physical condition; (5) the juvenile's previous dealings with the police or court appearances; (6) the extent of the explanation of rights; (7) the language of the warnings given; (8) the methods of interrogation; (9) the length of interrogation; (10) the length of time the juvenile was in custody; (11) whether the juvenile was held incommunicado; (12) whether the juvenile was afforded the opportunity to consult with an adult; (13) the juvenile's understanding of the offense charged; (14) whether the juvenile was warned of possible transfer to adult court; and (15) whether the juvenile later repudiated the statement.

*Benoit*, 126 N.H. at 15, 490 A.2d at 302. To find a valid waiver, the trial court must be persuaded by a sufficient number of favorable findings that a juvenile relinquished his right against self-incrimination in an intelligent, knowing, and voluntary manner. *See id.* at 19, 490 A.2d at 304.

A juvenile cannot be deemed to have knowingly waived his rights under any circumstances unless he is advised of the possibility of prosecution as an adult and the rights to be waived must be explained in a simplified fashion. *See id.* Our conclusions in *Benoit* were reached in the context of the existing statutory mandate that

> in *all* cases, juvenile or criminal, the law requires that the officer in charge of a police station to which an arrested person is brought *"shall immediately* secure" from the arrestee the name of a parent, near relative, friend or attorney with whom the person may desire to consult "and *immediately notify*" such person.

*Id.* (quoting RSA 594:15). The defendant asserts that the required notice was not given and that his *Miranda* waiver should be deemed invalid as a matter of law.

The procedural requirements of RSA 594:15 are clearly intended for the benefit of the arrestee and violation of the statute constitutes a misdemeanor. *See* RSA 594:17 (1986). In the case of a juvenile, failure to comply with the statute may prevent the detained child from receiving valued assistance and counsel from a parent or guardian, near relative, friend, or attorney (parent or other adult), to whom he normally looks for guidance. Notifying a juvenile's parent or other adult must be understood to have some purpose, namely, to facilitate and aid a juvenile in seeking out a mature person with whom a juvenile may wish to consult. It is this notion that we sought to underscore in *Benoit* when expressly referencing RSA 594:15. *See Benoit*, 126 N.H. at 19, 490 A.2d at 304. Unfortunately, the facts of this case demonstrate that the statute is not always followed and, therefore, a juvenile may not always be given an opportunity to contact and confer with a parent or other adult. While we cannot say that a violation of the statute renders a juvenile waiver invalid as a matter of law as the defendant contends, it is apparent that additional safeguards are needed to ensure that juveniles are afforded *every* opportunity to notify and consult with their parent or other adult prior to waiving their *Miranda* rights.

■ Parents or other adults are in a position to help juveniles in understanding their rights, acting intelligently in waiving them, and otherwise remaining level-headed in the face of police interrogation. *See Gallegos v. Colorado*, 370 U.S. 49, 54 (1962); *see also State v. Presha*, 748 A.2d 1108, 1119 (N.J. 2000). In an effort to preserve the requisite measure of special protection afforded juveniles, we hold that when RSA 594:15 is not followed, the absence of an opportunity to consult with an adult shall be given greater weight when assessing the totality of the circumstances surrounding a juvenile waiver. *See Benoit*, 126 N.H. at 15, 490 A.2d at 302.

■ In *Moran v Burbine*, 475 U.S. 412, 422-28 (1986), the United States Supreme Court held that an adult suspect does not have a right under *Miranda* to be advised by police that an attorney is attempting to reach him. While *Burbine* has been widely cited for the proposition that an adult suspect in custody need not be advised that his attorney is present, an issue we have never reached, we are unwilling to apply *Burbine* to cases involving juvenile suspects and their parents or legal guardians. "It is one thing to hold that an adult need not be advised of an attorney's presence in another room . . . . [i]t is a far different thing to declare, as a matter of law, that a . . . . child need not be informed that his [parent] awaits in an adjoining room." *In re Lucas F.*, 510 A.2d 270, 274 (Md. App. 1986).

We note that "all courts that have applied [the totality of the circumstances] standard to a case in which a parent was deliberately excluded [from consulting with his child] have suppressed the confession." *Presha*, 748 A.2d at 1119 (citations omitted) (Stein, J., concurring). Accordingly, we also hold that when a parent or guardian arrives at a police station or other site of custodial detention and requests to see a child in custody, the police must: (1) immediately cease interrogating the juvenile; (2) notify him that his parent or guardian is present at the station; and (3) immediately allow the parent or guardian into the interrogation room.

In this case, the police failed to comply with the notice requirement of RSA 594:15. We express no opinion whether this failure alone tips the scale in favor of the defendant under a totality of the circumstances analysis. Here, the defendant's father fortuitously discovered his son was in custody and proceeded to the police station. While he was at the station requesting to see his son, the police did not cease the interrogation or inform the defendant that his father wanted to consult with him. Further, they made no effort to allow the defendant's father into the interrogation room immediately. In sum, the police effectively sequestered the defendant while obtaining his statements, and left his father waiting in the wings. Such conduct is inconsistent with the increased care required when a juvenile is detained and interrogated, and renders the defendant's *Miranda* waiver invalid. Accordingly, on remand for retrial the challenged statements to the police should be suppressed.

A certain amount of speculation is inherent in assessing the totality of the circumstances surrounding a juvenile's statements. Thus, as was true in *Benoit*, our holdings today "will not put an end to controversies surrounding a juvenile's waiver of constitutional rights." *Benoit*, 126 N.H. at 19, 490 A.2d at 304. Courts have recognized, however, that videotaping custodial interrogation may lessen the inherent speculation, avoid unwanted claims of coercion, and generally assist all parties in assessing what transpired during the interrogation. *See In re G.O.*, 727 N.E.2d 1003, 1014 (Ill. 2000); *Commonwealth v. Fryar*, 610 N.E.2d 903, 909-10 n.8 (Mass. 1993); *State v. James*, 858 P.2d 1012, 1017-18 (Utah App. 1993); *State v. Buzzell*, 617 A.2d 1016, 1018 (Me. 1992); *see also* Schlam, *Police Interrogation of Children and State Constitutions: Why Not Videotape the MTV Generation?*, 26 U. TOL. L. REV. 901 (1995). In light of the benefits associated with videotaping, we suggest that, to the extent possible, custodial interrogation of juveniles be videotaped.

## II

We also address the defendant's second, third, and fourth arguments as they involve errors that may likely arise on remand. *See State v. Frost*, 141 N.H. 493, 498, 686 A.2d 1172, 1176 (1996). We turn initially to the defendant's second argument that the trial court erred when it denied his motion to vacate his certification as an adult. Specifically, he argues that the prosecution's failure to disclose the laboratory notes of its handgun expert prior to his certification hearing violated his right to due process under the State and Federal Constitutions by denying him access to material evidence. *See Brady v. Maryland*, 373 U.S. 83 (1963); *State v. Laurie*, 139 N.H. 325, 653 A.2d 549 (1995). The State counters that, in the context of a certification hearing, a juvenile defendant is not entitled to full discovery, but rather is entitled only to discover information essential to determine whether sufficient evidence exists to support an indictment. In addition, the State contends that it was not required to produce the notes, which commented on apparent abnormalities of the handgun, because they did not constitute favorable exculpatory evidence and were therefore not covered by any duty to disclose.

We first examine the defendant's assertions under the New Hampshire Constitution. *See State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983). Because Part I, Article 15 of the New Hampshire Constitution is at least as protective of the due process rights of the accused as the Federal Constitution, we address only his claims under the State Constitution and look to federal cases for guidance only. *See id.* at 233, 471 A.2d at 352.

When a criminal defendant alleges that his due process right has been violated by the State's failure to disclose material evidence, he must show that "favorable, exculpatory evidence [was] knowingly withheld by the prosecution." *Laurie*, 139 N.H. at 330, 653 A.2d at 552. After such a showing, "the burden shifts to the State to prove beyond a reasonable doubt that the undisclosed evidence would not have affected the verdict." *Id.* Evidence is favorable "if it is material to guilt or to punishment." *Id.* at 528, 653 A.2d at 551 (citing *Brady v. Maryland*, 373 U.S. at 87).

 We affirm the trial court's finding that the laboratory notes of the State's expert did not contain favorable evidence "which likely would be material to either guilt or punishment of the defendant in this case." Although the notes indicated an abnormal trigger pull measurement, the State's expert concluded that the gun "functioned normally during test firing," and was not "sensitive to jar-off." At

trial, his testimony corroborated his original conclusion. He stated that there existed "no significant mechanical malfunction with the firearm," and that "overall, it was in good condition." In addition, he reported that the safety functioned effectively and when set, prevented the gun from discharging. Significantly, the expert also indicated that substantial pressure was required to discharge the weapon, and that it was not, as the defendant contends, "capable of being discharged with the safety on" or "without the trigger even being pulled." Based upon the record, we conclude that the notes did not constitute favorable evidence.

Because we hold that the disputed material was not favorable, we need not decide whether the due process rights articulated in *Laurie* apply to juvenile certification hearings, which are properly regarded as investigatory rather than adjudicative proceedings. *See, e.g., In re Eduardo L.*, 136 N.H. 678, 687, 621 A.2d 923, 930 (1993).

### III

We next turn to the defendant's argument that the trial court erred in admitting evidence of his conduct during the four days preceding the shooting. Specifically, the State moved to introduce evidence that the defendant: (1) removed a handgun from a locked container in his father's room on February 15, 1996, without his father's knowledge; (2) concealed the handgun and used it for target practice; (3) displayed the handgun to friends, demonstrating his knowledge of the handgun's operation; (4) took the handgun to a shopping mall and displayed it to friends; (5) pointed the handgun out a window while in the company of friends on February 17, 1996; and (6) pointed the handgun directly at the victim days before the shooting.

The trial court found that the defendant's conduct prior to the shooting was not evidence of "other crimes, wrongs, or acts" because it was "intertwined" with, and could not be separated from, the charged crime. Finding New Hampshire Rule of Evidence 404(b) inapplicable, the court admitted the evidence finding it relevant and highly probative under Rules 401, 402, and 403. On appeal, the defendant contends that the trial court erred in finding New Hampshire Rule of Evidence 404(b) inapplicable to the disputed evidence.

■ Absent a showing that the trial court's decision was "clearly untenable or unreasonable to the prejudice of [one's] case," we will not disturb a trial court's determination regarding the admissibility

of evidence. *State v. Stayman*, 138 N.H. 397, 402, 640 A.2d 771, 774 (1994) (quotation omitted). In this case, we find that the disputed evidence constituted extrinsic evidence of "other acts" which was subject to analysis under Rule 404(b). In this regard, the trial court erred in finding the Rule inapplicable. Should the disputed evidence be offered by the prosecution upon remand, the trial court should analyze its admissibility according to Rule 404(b).

## IV

The defendant further contends that to demonstrate the internal mechanisms of the handgun, his expert should have been permitted to disassemble it at trial. In denying this opportunity to the defendant, the trial court reasoned that he would "have an adequate opportunity to make [his] case [that the handgun discharged accidentally] through . . . testimony . . . charts and . . . photographs by the experts." On appeal, the defendant argues that, because the photographs were flawed and not sufficiently clear to permit the jury to see the damage to the handgun's internal mechanisms, the court's ruling prejudiced his defense in violation of Part I, Article 15 of the New Hampshire Constitution.

"In order to show a violation of due process under Part I, Article 15, a defendant must show that the [evidence] he was precluded from introducing would have been material and favorable to his defense in ways not merely cumulative of other evidence." *State v. Graf*, 143 N.H. 294, 301, 726 A.2d 1270, 1276 (1999) (quotation omitted). "Cumulative evidence is defined as additional evidence of the same kind to the same point." *State v. Davis*, 143 N.H. 8, 12, 718 A.2d 1202, 1204 (1999) (quotation omitted).

The defendant's expert testified at length that the handgun's hammer and sear had been altered which compromised the handgun's safety mechanism. In addition, he produced multiple photographs of the handgun's hammer and sear that he took while disassembling it, as well as several photographs of "good" handgun parts. Moreover, he sketched two different illustrations of the existing flaws he observed within the handgun's safety mechanism, and one illustration of a properly functioning safety mechanism for comparison. Although the defendant argues on appeal that his expert's handgun photographs were not sufficiently clear to demonstrate the identified flaws to the jury, the defendant's expert only remarked upon the poor quality of one photograph.

Based solely upon the record before us, the demonstrative evidence sought to be admitted by the defendant was merely

duplicative of other evidence already before the jury and the trial court properly excluded it. *See Graf*, 143 N.H. at 301, 726 A.2d at 1276.

*Reversed and remanded.*

BROCK, C.J., concurred; HORTON, J., retired, specially assigned under RSA 490:3, concurred.