Coos
No. 2000-675

The State of New Hampshire

v.

Lorraine G. Gabusi

Argued: February 12, 2003
Opinion Issued: April 18, 2003

*Stephen J. Judge*, acting attorney general (*Philip B. Bradley*, assistant attorney general, on the brief and orally), for the State.

*Twomey & Sisti Law Offices*, of Chichester (*Howard Clayman* on the brief and orally), for the defendant.

DUGGAN, J. The defendant, Lorraine G. Gabusi, appeals her conviction in the Superior Court (*Smith*, J.) for one count of theft by deception and two counts of theft by unauthorized taking or transfer. The defendant argues that the trial court erred in several hearsay rulings. We affirm.

The record supports the following facts. The defendant was the younger sister of Raymond and Ruth Laveron, elderly siblings who lived together in a remote home in Milan. For many years, Raymond had taken care of Ruth, who was deaf and legally blind. In June of 1997, however, Raymond learned that he had terminal liver cancer and would not live much longer. On July 16, 1997, the defendant arrived in New Hampshire to help Raymond with his affairs.

Prior to the defendant's arrival, Raymond held over $200,000 in various bank accounts. He had executed a will in 1988 that placed all of his assets

in trust for the benefit of Ruth during her life, and left the remainder to the defendant. While dying of cancer, Raymond told three witnesses that he intended to care for Ruth for the rest of her life.

The first of these witnesses, Josee Bourbeau, was Ruth's doctor. She testified that she understood Raymond wanted Ruth to be placed in the most comfortable setting possible, where she would be pampered and cared for, as opposed to a regular nursing home. When Dr. Bourbeau asked Raymond whether the defendant shared this goal, he responded, "It's not a problem . . . I want her to be in good hands."

The second witness, attorney Thomas Cote, discussed estate planning with Raymond. During their initial phone conversation, Raymond told Cote that caring for Ruth was his primary goal. Cote testified that "[Raymond] did not want State assistance for his sister. He made it very clear that he had the funds and those were going to be provided for his sister Ruth during her lifetime and that whatever was left would go to Lorraine." At a subsequent meeting with Raymond and the defendant, Cote advised them both that the 1988 will would effectively carry out Raymond's plans. The defendant, however, suggested that Raymond leave all of his money to her, stating that she would take care of Ruth's needs. Cote recommended against this option because it was "a riskier way of handling his estate and also in carrying out his wishes after his death." The meeting adjourned without a decision because Raymond became tired, and had to rest. Cote was never able to speak with Raymond again.

The third witness, social worker Jane Gilligan, spoke with Raymond while completing a precautionary application for State financial assistance for Ruth's benefit. Raymond told Gilligan that he "wanted what was best for Ruth," that he planned to provide for her in the future, and that he did not intend for her to rely upon State assistance. He also stated that Thomas Cote was "getting his affairs in order so that Ruth would be completely provided for upon his death."

On about July 21, 1997, the defendant contacted Tyler Harwell, another attorney. She told Harwell that both her brother and sister wished to execute new wills leaving their property entirely to her, without any provision for the care of Ruth. She also told Harwell that both siblings wished to execute durable powers of attorney that appointed her as the attorney in fact. Harwell arrived in Milan a few days later to meet with Raymond and Ruth, having already drafted Raymond's will according to the defendant's instructions. Harwell claims to have explained the documents to Raymond and Ruth, but never asked Raymond any questions about why he wished to change his testamentary plans. On July 24, Harwell returned with witnesses, and Raymond and Ruth signed the wills and powers of attorney.

Almost immediately thereafter, the defendant began to transfer Raymond's and Ruth's assets into her own accounts. She transferred Raymond's money, along with some $47,000 that Ruth had in a joint account (the Berlin City account) with her brother, into a joint account she established in her name and Raymond's name. The defendant also moved Ruth into a private, assisted-living center on August 7th.

Raymond died on August 18, 1997. The defendant subsequently wrote herself checks totaling $290,000 from the joint account she had held with him. She continued to pay Ruth's bills for medication and boarding expenses until November of 1997. At that time, she wrote Ruth's pharmacist that she would not pay for any more medication, and informed the assisted living center that she wanted to move Ruth out of the center and into a large nursing home that accepted Medicaid. Although the defendant still held thousands of dollars of Ruth's money, the defendant filled out a Medicaid application in which she represented that Ruth had no funds of her own.

The defendant's behavior aroused the suspicion of Gilligan, who helped Ruth obtain legal assistance. Ruth revoked the power of attorney in December of 1997, and contested the validity of Raymond's new will. The probate court found the will was invalid because of undue influence.

In 1999, the State charged the defendant with one count of theft by deception, RSA 637:4 (1996), for taking Raymond's money by creating a false impression that she intended to use the money for the benefit and care of Ruth, and two counts of theft by unauthorized taking, RSA 637:3 (1996), for depriving Ruth of her money by means of the power of attorney. At trial, the defendant maintained that she had no intent to steal from either sibling. She testified that she believed Raymond's new will was valid and that he wished her to have all of his money free of any obligation to care for Ruth. The defendant also claimed to be unaware that the joint account between Raymond and Ruth held Ruth's money. She claimed to have Raymond's permission to execute the transactions from that account and from others owned by Raymond.

After a six-day trial, the jury returned a guilty verdict on all three counts. The court sentenced her to a term of five to ten years in prison, suspending one and one-half years of the minimum and four years of the maximum sentence.

On appeal, the defendant raises three evidentiary issues. First, she argues that the statements Raymond made to the three witnesses regarding his intention to care for Ruth were inadmissible hearsay. Second, she argues that the admission of these statements violated the Confrontation Clauses of the State and Federal Constitutions. Finally, she argues that the court erred in invoking the rule against hearsay to prevent

her from testifying about statements Raymond made to her regarding the ownership of the Berlin City account.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.H. R. Ev. 801(c). Hearsay is inadmissible unless it falls within a recognized exception. *See* N.H. R. Ev. 802. We will affirm a trial court's decision to admit or exclude hearsay evidence absent an unsustainable exercise of discretion. *State v. Gaffney*, 147 N.H. 550, 556 (2002).

The defendant first argues that the testimony of Dr. Josee Bourbeau, Thomas Cote, and Jane Gilligan regarding Raymond's intentions to care for his sister was inadmissible hearsay. The trial court admitted these statements under the "state of mind" hearsay exception, which encompasses:

> statement[s] of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

N.H. R. Ev. 803(3).

Statements falling under this exception may be used "to show the occurrence of subsequent events." N.H. R. Ev. 803 Reporter's Notes; *see Fissette v. Railroad*, 98 N.H. 136, 143 (1953). In *Fissette*, we held that a decedent's hearsay statement that "I will drive the Ford up to Summer Street and if the train hasn't gone I will hear it" was admissible to show that the decedent subsequently approached the railroad and listened for the train. *Fissette*, 98 N.H. at 142-43; *accord Mutual Life Insurance v. Hillmon*, 145 U.S. 285, 295-96 (1892). Likewise, Raymond's repeated statements that he intended to care for his sister after his death were admissible to show that his subsequent execution of a will that made no such provision, and subsequent execution of a power of attorney, were the products of deception.

The defendant argues that the statements were admitted not to show Raymond's state of mind, but instead to prove "the truth of his belief that [the defendant] would use his money to care for [Ruth]." This objection apparently tracks the language of Rule 803(3), which forbids the use of a "statement of memory or belief to prove the fact remembered or believed" in most circumstances. In this case, however, the "truth" of Raymond's post-mortem plans was not at issue. Rather, the relevance of the

statements stems from Raymond's *belief* that they would be carried out, which in turn implies that the defendant created a false impression to obtain Raymond's money. We therefore hold that the trial court did not err in finding the statements were admissible under Rule 803(3).

Next, the defendant argues that these statements violated her rights under the Confrontation Clauses of the Federal and State Constitutions. Because the Federal Confrontation Clause affords no greater protection than the State Confrontation Clause, we need only undertake a State analysis, reviewing federal cases for guidance. *See State v. Spaulding*, 147 N.H. 583, 588 (2002); *Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999) (stating federal standard for Confrontation Clause regarding admission of hearsay).

 Hearsay statements ordinarily do not violate a defendant's right to confront witnesses so long as they bear "particularized guarantees of trustworthiness," *State v. Cook*, 135 N.H. 655, 662 (1992), or fall within a "firmly rooted hearsay exception." *State v. Bader*, 148 N.H. 265, 277 (2002); *but see State v. Christiansen*, 135 N.H. 583, 586 (1992) (blood test report admitted without live testimony constitutes "trial by certificate and affidavit" and violates Confrontation Clause). We find that Raymond's statements possessed sufficient guarantees of trustworthiness. While many of his statements were responses to questions, Raymond's answers were spontaneous in the sense that they described his contemporaneous state of mind. *Cf. Cook*, 135 N.H. at 664 (holding answer "spontaneously volunteered in response to a question that was neither leading nor suggestive" is a factor establishing reliability of statement against penal interest). Likewise, it is highly unlikely that Raymond would deliberately misrepresent his estate plans to three different persons attempting to help him carry out his wishes in the last months of his life.

 The defendant's constitutional objections to the hearsay statements center on the vagueness and faulty memory she alleges in the testimony of the three witnesses at trial. This objection, however, relates not to the reliability of the hearsay declarant's statements, but to the reliability of the witnesses testifying in court. *See State v. McLaughlin*, 135 N.H. 669, 675 (1992). The defendant had a full and fair opportunity to confront these witnesses about their memory, truthfulness and bias. *Cf. Cook*, 135 N.H. at 663. For these reasons, we find that the admission of the hearsay statements did not violate the Confrontation Clause.

Finally, the defendant argues that the trial court erroneously excluded Raymond's alleged statements regarding the Berlin City account. The prosecution alleged that this account belonged to Ruth and that the defendant stole money from it. Gabusi's defense was that she believed the

account belonged to Raymond and not Ruth, that she was acting under Raymond's direction in transferring the money while he was alive, and that the 1997 will represented Raymond's true intentions. At trial, she testified on direct examination as follows:

Q: After Ray had passed away, you ended up moving around — or some of the money got moved while Ray was alive, right?

A: Yes.

Q: And that dealt with the wire transfers that we were talking about?

A: And all the wire transfers brought the money together.

Q: Now, there's a number of passbooks from Berlin City, and there's some writing on these, Exhibits 20 and 63. Do you remember these passbooks?

A: Yeah.

Q: Now, the writing on there, where did you — how did you know to put that writing on which account?

A: I put "Ray" on because his social security check was deposited in this account. There was nothing on the inside to indicate who this belonged to.

Q: Okay. And did you — did Ray talk about that account at all?

A: Ray said he had his social security check deposited —

Mr. Delker [for the State]: Objection.

At the subsequent bench conference, the State argued that this testimony was inadmissible hearsay because it related to "who owns that account, which is for the truth of the matter asserted." The trial court sustained the objection.

Although the trial court correctly noted the statement was not admissible for the truth of the matter it asserted, we find that the decision to exclude it was an unsustainable exercise of discretion. At the bench conference, the defendant's counsel explained that the statement would be introduced not to prove who actually owned the account, but to show that the defendant *believed* Raymond owned the account, and thus to show that she had no intent to steal from Ruth. Because the truth of Raymond's alleged claim of ownership was unnecessary to this defense, the statement was not hearsay if admitted for the limited purpose of showing the

defendant's intent or purpose. *See State v. McPherson*, 127 N.H. 826, 828 (1986).

The State argues that even if the court erred in sustaining the objection, the error was harmless. When the trial court has erroneously excluded evidence, we must reverse unless the State can show beyond a reasonable doubt that such error did not affect the verdict. *State v. Demeritt*, 148 N.H. 435, 440 (2002).

The defendant testified to the substance of the excluded statement at several other points during her direct and cross-examination. Before the objection, defendant's counsel had asked her whether Raymond told her to transfer money from the accounts. She replied, "Yes. It was with Ray's guidance that everything was done." Just after the objection, the defendant testified that Ray had specifically authorized her to move money from the Berlin City account. She also testified that she considered Raymond's will to be valid and the money from the Berlin City account to belong to her after his death "[b]ecause Ray had left it to me." Under cross-examination, she reiterated that Raymond intended to give her the money in the Berlin City account. Because the defendant was able to present evidence supporting her claim that she believed the account belonged to Raymond, the excluded testimony was cumulative and we conclude beyond a reasonable doubt that it would not have affected the jury's verdict. *See State v. Sonthikoummane*, 145 N.H. 316, 323 (2000).

At oral argument, the defendant waived a fourth issue relating to hearsay, and the parties agreed that a fifth issue relating to restitution had become moot. Having considered all the defendant's arguments, we affirm the decision of the superior court.

*Affirmed.*

BROCK, C.J., and NADEAU and DALIANIS, JJ., concurred; BRODERICK, J., concurred specially.

BRODERICK, J., concurring specially. I agree with the majority that this case should be affirmed. I also agree that the trial court did not err in admitting statements made by Raymond Laveron to Dr. Bourbeau, Attorney Cote and Ms. Gilligan under New Hampshire Rule of Evidence 803(3) (Rule 803(3)). I write separately, however, because I disagree with a portion of the analysis concerning the admission of those statements.

Raymond Laveron executed a will in 1988. Under the terms of the will, all of Raymond's assets would be placed in trust for the benefit of his sister, Ruth Laveron, during her lifetime. Upon Ruth's death, the remainder of the trust would be paid to the defendant. After being diagnosed with terminal liver cancer in June 1997, Raymond told

Bourbeau, Cote and Gilligan that he intended to care for Ruth for the rest of her life.

Subsequent to Raymond's statements, the defendant contacted Attorney Harwell and told him that Raymond wished to execute a new will, which would leave his assets entirely to her, with no provision for the care of Ruth. The defendant also told Attorney Harwell that Raymond wished to execute a durable power of attorney, appointing her as his attorney in fact. On July 24, 1997, Raymond executed the new will and durable power of attorney; he died less than one month later.

The trial court admitted Raymond's statements to Bourbeau, Cote and Gilligan, concerning his intentions to care for Ruth, under Rule 803(3). The defendant argues that the statements were inadmissible hearsay. Rule 803(3) excepts from the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

I agree with the majority that our case law supports the conclusion that statements "of then existing state of mind" may be used to show the occurrence of subsequent events. *See* N.H. R. Ev. 803 Reporter's Notes; *Fissette v. Railroad*, 98 N.H. 136, 142-43 (1953); *see also Mutual Life Insurance v. Hillmon*, 145 U.S. 285, 295-96 (1892). I do not support the majority's conclusion, however, that Raymond's repeated statements that he intended to care for Ruth after his death, statements which were made prior to his execution of a new will and power of attorney, "were admissible to show that his subsequent execution of a will that made no such provision, and subsequent execution of a power of attorney, were the products of deception."

Raymond's earlier statements of his intent could be used to show that a subsequent will containing provisions for Ruth's care was in keeping with his intent. Raymond's execution of a will and power of attorney containing provisions contrary to his previously expressed intention to care for Ruth, however, is indicative only of an apparent change in Raymond's intent. The reasons behind such an apparent change might include incompetence, deception, or a bonafide change of intent on the part of the testator. Raymond's statements, by themselves, are not competent evidence to show one of these reasons to the exclusion of the others or why a subsequent event did *not* occur.

The defendant also argued that Raymond's statements were admitted, not to show his state of mind, but to prove the truth of his belief that the defendant would use his money to care for Ruth. The majority finds that:

> [T]he "truth" of Raymond's post-mortem plans was not at issue. Rather the relevance of the statements stems from Raymond's *belief* that they would be carried out, which in turn implies that the defendant created a false impression to obtain Raymond's money.

Pursuant to Rule 803(3), the trial court could have admitted Raymond's statements because they were indicative of his then existing state of mind prior to executing his new will and power of attorney. In addition, the statements could be admitted because of the internal exception to Rule 803(3), that is, as "statement[s] of memory or belief to prove the fact remembered or believed," because they related to the "terms of declarant's will." Although I concur with the majority that the trial court did not err in admitting the statements, I do not agree that the statements, by themselves, imply that the defendant created a false impression to obtain Raymond's money.