Hillsborough-northern judicial district
No. 2009-072

# The State of New Hampshire

v.

## Robinson Garcia

Argued: April 7, 2011
Opinion Issued: September 22, 2011

*Michael A. Delaney*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Lisa L. Wolford*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

HICKS, J. The defendant, Robinson Garcia, was certified as an adult and convicted of one count of second-degree murder, *see* RSA 630:1-b, I(b) (2007), and one count of riot, *see* RSA 644:1, I (2007). On appeal, he argues that the Superior Court (*O'Neill*, J.) erroneously: (1) denied his motions to suppress; (2) excluded the testimony of a defense witness; and (3) prohibited him from testifying about statements made by the victim. We affirm.

The defendant's convictions arise out of the August 11, 2005 beating of Stephen Raymond in Manchester. After Raymond's death in 2006, the

defendant was charged with second-degree murder, in that, acting in concert with Larry Barbosa, he caused the death of Raymond under circumstances manifesting extreme indifference to the value of human life by striking Raymond in the head with a baseball bat. The defendant was also charged with three alternative theories of felony-level riot, alleging that he assembled with others with the purpose of causing Raymond to suffer serious injuries.

The trial court made a number of rulings unfavorable to the defendant. First, it denied his motions to suppress statements he made to the Manchester police that he claimed were obtained in violation of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Next, at trial, it excluded testimony of a defense witness regarding statements made by co-defendant Barbosa implicating himself in Raymond's death. Finally, it excluded on hearsay grounds testimony by the defendant of statements made to him by the victim. The defendant appeals these rulings. We address each of the defendant's arguments in turn.

*I. Suppression*

On August 17, 2005, Sergeant James Flanagan of the Manchester Police Department received a telephone call from the defendant's mother, Marisol Gonzalez, who said that she believed her son, then sixteen years old, was involved in Raymond's beating. Shortly thereafter, Flanagan and Detective Michael Biron went to Gonzalez's home to speak with her. Both officers were wearing plain clothes and a side-arm with a visible badge.

Gonzalez told the officers that, on the day of the beating, the defendant left the house with Randal Rodriguez after being informed by a group of children that a fight was about to occur. She later realized a red baseball bat was missing from her porch. The defendant returned approximately fifteen minutes later, immediately changed his clothes and did not leave the house for three days. Several days later she spoke with him about what had happened that day, and he told her there had been a "little fight" but did not provide her with any details.

While the officers were there, Gonzalez telephoned the defendant's girlfriend's house and was told that the defendant was at Bear Brook State Park in Allenstown. The officers thereafter drove an unmarked police cruiser to Bear Brook State Park, where they found the defendant on the beach preparing to go for a canoe ride with a group of people. They introduced themselves and told the defendant that they would like to speak with him. The defendant "agreed readily" and walked with the officers approximately twenty feet away from the group.

The officers then asked the defendant if he knew why they wanted to speak with him, and he indicated that he did not. They explained that they

were investigating Raymond's beating, that they had spoken with his mother, and they understood that he might have some information. They then read him his *Miranda* rights, using a simplified form for juveniles known as a *Benoit* form, *see State v. Benoit*, 126 N.H. 6, 22-24 (1985). Flanagan reviewed each portion of the form with the defendant, who initialed each portion and indicated that he understood. He also indicated that he understood the waiver of rights portion of the form and that he was willing to speak with the officers.

The defendant told the officers that on the day of the beating, some children came to his house and told him there was a problem involving an older man and the defendant's brother. He left his house with an aluminum baseball bat to find out what was going on. When he arrived at the scene, an older man confronted him; however, after learning that his brother was not involved, he left and returned home. Later that day, another group of children came to his house and told him there was about to be a fight. He again left his house with a baseball bat. This time he was confronted by an older man who challenged him to fight. The defendant said that as he was being challenged, a group of people attacked the man. The defendant then threw his bat down and ran away.

Flanagan falsely told the defendant that an area resident had videotaped the altercation, which would enable the police "to find out who did exactly what." The defendant then said that he had used the bat defensively, making "check swings," before running away, but that he did not know who hit the victim with the bat.

After approximately twenty minutes, the officers asked the defendant if he would go to the police station to continue to speak with them. He agreed on the condition that he be allowed to return to Bear Brook State Park. The officers told him that they would call his mother "and see if she wants to be present when we talk to you, and you can ask her. It will be up to her." The defendant "seemed completely satisfied" and agreed to go with the officers. At no time did the officers ask the defendant if he would like to consult with his mother or any other interested adult.

Upon arriving at the police station, the officers escorted the defendant to an interview room in the juvenile unit. Flanagan testified that he called Gonzalez and asked her if she wanted to come to the police station and take part in the interview. He testified that Gonzalez said "no . . . just give me a call when you're done," and that she gave him permission to speak with the defendant.

The officers again reviewed a *Benoit* form line by line with the defendant and asked if he understood. He read the waiver portion of the form out loud and "seemed to have a complete understanding as to what [the officers] were asking him." He waived his rights and initialed the form accordingly.

Throughout the interview, the defendant maintained his version of the events. At one point, the officers took a five-to-ten-minute break and left the defendant in the interview room. When they returned, they questioned him "a little stronger" about inconsistencies in his version of events. At this point, he told the officers that he realized they did not believe him and that he had nothing further to say. The officers then concluded the interview and arrested the defendant. The entire interview at the police station lasted about one hour.

On appeal, the defendant argues that his statements were obtained in violation of his right against self-incrimination under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. Specifically, he alleges that he was in custody for *Miranda* purposes at Bear Brook State Park once the officers told him they wanted to speak with him and that he did not waive his constitutional rights in conformity with *Benoit* and *State v. Farrell*, 145 N.H. 733 (2001). We first address the defendant's claims under the State Constitution and look to federal cases only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

■ The New Hampshire Constitution provides that "[n]o subject shall be . . . compelled to accuse or furnish evidence against himself." N.H. CONST. pt. I, art. 15. Thus, "to overcome the presumption that a defendant would not normally forfeit this constitutional protection, the State must prove beyond a reasonable doubt that a defendant knowingly, intelligently, and voluntarily waived this right." *Farrell*, 145 N.H. at 736. As the trial court is in the best position to weigh the credibility of witnesses, we will not reverse a trial court's finding on the issue of waiver "unless the manifest weight of the evidence, when viewed in the light most favorable to the State, is to the contrary." *Id.* (quotation omitted); *see also State v. Plch*, 149 N.H. 608, 617 (2003).

■■ In *Benoit*, we addressed the capacity of juveniles to waive their rights and ruled that a totality of the circumstances approach should be used to determine whether a juvenile has validly done so. *Benoit*, 126 N.H. at 15-17. We adopted a fifteen-factor test for trial courts to utilize when evaluating a juvenile's purported waiver:

> (1) the chronological age of the juvenile; (2) the apparent mental age of the juvenile; (3) the educational level of the juvenile; (4) the juvenile's physical condition; (5) the juvenile's previous dealings with the police or court appearances; (6) the extent of the explanation of rights; (7) the language of the warnings given; (8) the methods of interrogation; (9) the length of interrogation; (10) the length of time the juvenile was in custody; (11) whether the

juvenile was held incommunicado; (12) whether the juvenile was afforded the opportunity to consult with an adult; (13) the juvenile's understanding of the offense charged; (14) whether the juvenile was warned of possible transfer to adult court; and (15) whether the juvenile later repudiated the statement.

*Id.* at 15. We ultimately concluded that:

> before a juvenile can be deemed to have voluntarily, knowingly and intelligently waived his or her fundamental constitutional rights under part I, article 15 of the New Hampshire Constitution, (1) he or she must be informed, in language understandable to a child, of his or her rights, (2) the court must review and make findings on each of the factors enumerated . . . above surrounding the giving of the statement, (3) the judge . . . must be persuaded by an adequate number of favorable findings that the waiver was made voluntarily, intelligently and with full knowledge of the consequences, and (4), if facing charges that would constitute a felony if committed by an adult, the juvenile must be informed of the consequences of a certification to stand trial as a criminal defendant.

*Id.* at 18-19.

Assuming, without deciding, that the defendant was in custody at Bear Brook State Park when the officers said they wanted to speak to him, we hold that the trial court's finding of a knowing, intelligent and voluntary waiver is not contrary to the manifest weight of the evidence.

■ The defendant does not dispute that a simplified juvenile *Miranda* form, which included the warning that he could be certified as an adult, was twice used. Rather, he argues that "there were an insufficient number of findings to support the trial court's determination that" he knowingly, intelligently and voluntarily waived his right against self-incrimination. We disagree. The trial court made findings on each of the above-enumerated factors, at least twelve of which indicated that the defendant knowingly, intelligently and voluntarily waived his rights.

The trial court found that the defendant was less than two months away from his seventeenth birthday (factor one) and that the evidence did not support a finding that his apparent mental age or educational level were inconsistent with that of a sixteen year old (factors two and three). The court further found that the defendant did not allege that anything was wrong with his physical condition (factor four). While the court noted that the defendant had no prior dealings with the police or court appearances, it found that Flanagan twice reviewed a *Benoit* form with him, and

answered any questions he had regarding the form (factors six and seven). The court noted that Flanagan lied to the defendant about having a videotape of the altercation; however, it found that the interrogation was generally cordial (factor eight). Indeed, Flanagan testified that the tenor of the interview was "pretty cordial" and even when they decided to question the defendant "a little stronger," the interview did not "get out of hand or completely aggressive or anything." The trial court further found that the length of the entire custodial interrogation was over an hour (factors nine and ten) and the defendant was not held incommunicado (factor eleven).

The court found that the defendant understood the offense charged, noting that Flanagan and Biron explained why they wanted to speak with the defendant (factor thirteen). Further, it found that the defendant was warned of possible transfer to adult court through the use of two *Benoit* forms that indicated that if his case was transferred to adult court, he would have to go through the adult criminal system and, as a result, he could go to the county jail or state prison (factor fourteen). The court also found that the defendant did not later repudiate his statement (factor fifteen).

The defendant points to factor eleven and argues that he was effectively sequestered while the officers obtained his statements. The record, however, does not support the defendant's argument. Here, the officers initially spoke with the defendant outside, in a public setting, at Bear Brook State Park. At no time was he prevented from speaking with a lawyer, his mother or any other interested adult. Moreover, at no time was the defendant's mother denied the opportunity to speak with him. *Cf. Farrell*, 145 N.H. at 739 (finding defendant's *Miranda* waiver invalid where the police did not cease interrogating the defendant after his father arrived at the police station and requested to see the defendant and did not inform the defendant that his father wanted to speak with him or make any effort to allow the defendant's father into the interview room). Indeed, Flanagan testified that had Gonzalez wanted to attend the interview, he would have "welcomed her into the interview" and "waited for her to get there before [they] interviewed" the defendant.

The defendant also points to factor twelve and argues that he "was not afforded the opportunity to consult with an adult at either Bear Brook State Park or the Manchester Police Department." In *Farrell*, we made clear that when considering the totality of the circumstances surrounding a juvenile waiver, "the absence of an opportunity to consult with an adult shall be given greater weight." *Id.* at 738. However, we "express[ed] no opinion whether this failure alone tips the scale in favor of the defendant under a totality of the circumstances analysis." *Id.* at 739.

In this case, the trial court found that it "was not the officers' fault" that the defendant did not have the opportunity to consult with an adult because the defendant's "mother declined to come to the police station." This was an improper analysis of whether the defendant was afforded the opportunity to consult with an adult. Under this factor, the question is whether *the juvenile* was afforded the opportunity to consult with an adult. *See id.* at 738. Here, while Flanagan testified that he called Gonzalez to see if she wanted to come to the police station and take part in the interview, at no time was the defendant informed that he could consult with Gonzalez or another interested adult. Nonetheless, in light of the remaining number of favorable findings that the defendant's waiver was made voluntarily, intelligently and with full knowledge of the consequences, we cannot say that the trial court's finding that the defendant's waiver was valid in this case was contrary to the manifest weight of the evidence.

We intend no erosion of our holding in *Farrell* as to the weight to be given the absence of an opportunity to consult with an adult when assessing the totality of the circumstances surrounding a juvenile waiver. *See id.* Indeed, there may be circumstances in which the failure of the police to afford the juvenile the opportunity to consult with an adult may tip the scale in favor of the defendant under a totality of the circumstances analysis. Here, however, we cannot say that this failure rendered the defendant's *Miranda* waiver invalid.

Because the Federal Constitution is no more protective of the defendant than the State Constitution under these circumstances, *see id.* at 736; *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986) (State need prove waiver of *Miranda* protections only by a preponderance of the evidence), we reach the same conclusion under the Federal Constitution.

## II. Exclusion of Testimony of Defense Witness

The defendant next argues that the trial court erred in excluding the testimony of a defense witness regarding co-defendant Barbosa's out-of-court statements inculpating himself in Raymond's death. The defendant contends that the hearsay statements were admissible as statements against penal interest pursuant to New Hampshire Rule of Evidence 804(b)(3), and that the trial court's ruling violated his right to due process under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments to the United States Constitution. The State argues that even if the trial court erred by excluding the testimony, any error was harmless beyond a reasonable doubt. We agree.

On February 14, 2008, the defense witness met with Detectives Richard Nanan and James Soucy of the Manchester Police Department. She told

the detectives that she had been writing to Barbosa while he was incarcerated and provided them with letters she alleged were written by Barbosa. The letters allegedly had emboldened words, such as "I hit the dude with the bat," "he seen me with the bat," "I did it" and "he knew I did do this and he knows." The witness also told the detectives that after Barbosa was released from jail, he told her that he hit Raymond with the bat. She further stated that Barbosa told her that he took the bat from the defendant and hit Raymond with it.

The State bears the burden of proving that an error was harmless. *State v. Fox*, 150 N.H. 623, 624 (2004). Error is not harmless unless the State proves beyond a reasonable doubt that it did not affect the verdict. *Id.* An error may be harmless beyond a reasonable doubt if the alternative evidence of a defendant's guilt is of an overwhelming nature, quantity or weight and if the inadmissible evidence is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *State v. Gordon*, 161 N.H. 410, 416-17 (2011). In making this determination, we consider the alternative evidence presented at trial as well as the character of the inadmissible evidence itself. *Id.* at 417.

Assuming, without deciding, that the trial court erred in excluding the testimony of the defense witness, we conclude that this error was harmless because the alternative evidence of the defendant's guilt was of an overwhelming nature. For the jury to convict the defendant of second-degree murder, the State was required to prove, beyond a reasonable doubt, that the defendant "cause[d] such death recklessly under circumstances manifesting an extreme indifference to the value of human life." RSA 630:1-b, I(b).

The alternative evidence of second-degree murder included the testimony of Krystal Case that she witnessed a group of people around Raymond who was fighting with two kids. She testified that as she approached the scene, she immediately recognized the defendant standing nearby holding a baseball bat down by his side. She stated that she knew the defendant because he sat in the row next to her in algebra class the previous year. She testified that she saw the defendant run towards Raymond and hit Raymond "in the back of the head and the back" with the baseball bat "[a]bout two or three" times. She stated that Raymond then collapsed.

The alternative evidence also included testimony from one witness who saw two men hit Raymond with a bat and then saw Raymond fall to the ground. He testified that at this point everyone "took off" and one of the men ran by him with a bat and dropped the bat in a nearby dumpster. Detective Christopher Sanders testified that, on the day in question, he

located a red aluminum baseball bat in a dumpster near the scene of the altercation. Sanders identified this baseball bat at trial. The defendant later identified the same bat as his mother's and testified that it was the bat he brought to the scene when he confronted Raymond. Further, the evidence included the defendant's own testimony that he was present at the scene and that he used the bat to make "check swing[s]" at Raymond.

Moreover, the excluded evidence that Barbosa struck Raymond with the bat and confessed to doing so would have been cumulative. *Cf. State v. Dorval*, 144 N.H. 455, 457-58 (1999) (finding any error in trial court's ruling precluding defendant from cross-examining officer about statements made by uncharged party concerning that party's knowledge of crime scene was harmless where defendant was able to introduce alternative evidence that uncharged party knew about crime scene from other various sources). Before the defendant offered the testimony at issue here, the jury had heard deposition testimony from Felix Urena that, on the day in question, he saw the defendant pass the bat to Barbosa. Urena further indicated that he witnessed Barbosa hit Raymond twice. Similarly, the jury heard a statement from Carlos Martinez that he witnessed Barbosa hit Raymond with a baseball bat. Both Urena and Martinez stated that Barbosa confessed to them that he hit Raymond with the bat. Further, as mentioned above, another witness saw two men hit Raymond with a bat and one witness identified both the defendant and Barbosa as having a bat. Thus, the jury was made aware that Barbosa struck Raymond with a bat and confessed to doing so.

Finally, as to the riot charge, pursuant to RSA 644:1, I, the State had to prove that the defendant

> (a) [s]imultaneously with 2 or more other persons, . . . engage[d] in tumultuous or violent conduct and thereby purposely or recklessly create[d] a substantial risk of causing public alarm; or

> (b) . . . assemble[d] with 2 or more other persons with the purpose of engaging soon thereafter in tumultuous or violent conduct, believing that 2 or more other persons in the assembly have the same purpose; or

> (c) . . . assemble[d] with 2 or more other persons with the purpose of committing an offense against the person or property of another whom he supposes to be guilty of a violation of the law, believing that 2 or more other persons in the assembly have the same purpose.

RSA 644:1, I.

Here, the alternative evidence of riot was of an overwhelming nature. This evidence included the testimony of a witness who saw the defendant at the scene holding a baseball bat in a group of at least three other people all of whom "started yelling at [Raymond] and surrounding him." This same witness also saw Barbosa at the scene with a bat. Another witness testified that she saw the defendant at the scene with a baseball bat along with at least three other people who were arguing with Raymond. Accordingly, we conclude that the trial court's error, if any, was harmless.

*III. Victim's Statements*

Finally, the defendant argues that the trial court erred in excluding as hearsay his testimony about statements Raymond made challenging him to fight, calling him a "chicken" and asking him why he was walking away. The defendant argues that Raymond's statements were not being offered "for the truth of any point," but rather "to explain its effect on [his] state of mind; to explain, that is, the reasonableness of [his] testimony that he backed away from Raymond while checking his bat." The State disagrees but argues that even if the trial court erred, any error was harmless.

In this case, the State alleged that the defendant caused the death of Raymond by striking him in the head with a baseball bat. It further alleged that the defendant assembled with other individuals for the purpose "of physically attacking" Raymond. The defendant's theory of defense was that he never struck Raymond with the bat and that he only used the bat to make "check swings" at Raymond in self-defense.

At trial, the defendant testified on direct examination as follows:

Q: What did you observe about this white person?

A: I observed that he had a metal stake.

Q: Okay. What was he doing with it?

A: Challenging people with it.

Q: Okay. Was he challenging you?

A: Yes.

Q: And what did he say?

A: That if I wanted to —

MR. CULBERSON [for the State]: Objection, Your Honor. Hearsay. Can we approach, Your Honor?

At the subsequent bench conference, defense counsel indicated that the defendant was going to say that Raymond was challenging him to fight. The trial court sustained the State's objection.

Shortly thereafter, the following testimony ensued during the defendant's direct examination:

Q: Okay. And so you couldn't find him, and you said you decided that you were going to turn around and go home.

A: Yes.

Q: Okay. Something happened after that?

A: Yes.

Q: What was that?

A: As I was walking to — back to my house, I crossed the street. And when I crossed the street, I kept walking, and I heard somebody yelling. So I stopped and I turned around, and I seen the person that I was looking for running down the stairs.

Q: Okay. And who was that person?

A: Stephen Raymond.

Q: Okay. And what was he yelling?

MR. CULBERSON: Objection. Hearsay.

THE COURT: Sustained. Continue, counsel.

The defendant later again testified that Raymond "came down, down the stairs and — yelling and screaming at me. . . . Meaning . . . [Raymond] was saying. He sa[id] something about . . . ." The State then objected on hearsay grounds. The defendant's counsel indicated that the defendant would testify that Raymond asked him where he was going and if he was a chicken. The trial court sustained the State's objection.

Assuming, *arguendo*, that the trial court's rulings were error, we agree with the State that any error was harmless. As discussed above, when the trial court has erroneously excluded evidence, we must reverse unless the State can show beyond a reasonable doubt that such error did not affect the verdict. *State v. Gabusi*, 149 N.H. 327, 334 (2003). An error may be harmless beyond a reasonable doubt if the alternative evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and if the evidence that was improperly excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. *State v. Peters*, 162 N.H. 30, 36 (2011).

Here, we have already determined that the alternative evidence of the defendant's guilt was of an overwhelming nature. Against this alternative evidence, the testimony excluded by the trial court was merely cumulative. The defendant testified to the substance of the excluded statements at several other points during his direct and cross-examination. *See Gabusi*, 149 N.H. at 334 (finding that the testimony excluded was cumulative and,

thus, the State met its burden of proving beyond a reasonable doubt that it would not have affected the jury's verdict). Before the first objection, defense counsel asked the defendant whether Raymond was challenging him with a metal stake and the defendant replied, "yes." Shortly thereafter, the defendant testified that Raymond was "being aggressive" and "waving his stick." The defendant later testified that Raymond "came down . . . the stairs and — yelling and screaming at me." The defendant also testified that he made "check swing[s]" with the bat after Raymond started "walking fast towards" him. Finally, the defendant testified on cross-examination that he told the police that Raymond was calling him a chicken. Admission of more cumulative evidence of Raymond's statements would not have added to the defendant's theory that he only used the bat to make "check swings" in self-defense. *Cf. Dorval,* 144 N.H. at 457. Accordingly, based upon our review of the record, we conclude that the State has met its burden of proving that any error in excluding Raymond's statements to the defendant was harmless beyond a reasonable doubt.

The remaining issues raised by the defendant in his notice of appeal, but not briefed, are deemed waived. *In re Estate of King,* 149 N.H. 226, 230 (2003).

*Affirmed.*

DALIANIS, C.J., and DUGGAN, J., concurred; LYNN, J., concurred specially.

LYNN, J., concurring specially. I have serious reservations as to whether it is consonant with the judiciary's role for this court to have devised the detailed form appended to our decision in *State v. Benoit,* 126 N.H. 6 (1985), and to have announced that the failure to utilize that form or its equivalent creates a presumption that any custodial statement given by a juvenile cannot be admitted into evidence at trial, *see id.* at 18. In an appropriate case, I would be willing to reconsider *Benoit's* holding that Part I, Article 15 of the New Hampshire Constitution requires something more than traditional totality-of-the-circumstances analysis for determining the admissibility of custodial statements made by at least older juveniles, such as the defendant in this case. *See Fare v. Michael C.,* 442 U.S. 707, 725-27 (1979); *see also J.D.B. v. North Carolina,* ___ U.S. ___, 79 U.S.L.W. 4504 (June 16, 2011) (holding that the age of a child subjected to police questioning, if known to the police or objectively apparent to a reasonable officer, is a factor that must be considered in determining if the child was in custody when the questioning occurred). However, inasmuch as these issues have not been raised in this case, I concur in the result reached by the majority.