IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 1, 2008

## STATE OF TENNESSEE v. CORDARO HUGHES

**Direct Appeal from the Criminal Court for Shelby County**
No. 05-01013     Chris Craft, Judge

---

**No. W2007-00955-CCA-R3-CD  - Filed August 21, 2008**

---

The defendant, Cordaro Hughes, was convicted by a Shelby County Criminal Court jury of first degree felony murder; especially aggravated robbery, a Class A felony; and attempted especially aggravated robbery, a Class B felony.  He was sentenced to life imprisonment for the first degree murder conviction, fifteen years at 100% for the especially aggravated robbery conviction, and eight years at 30% for the attempted robbery conviction, with the trial court ordering that the sentences be served concurrently, for an effective sentence of life imprisonment.  The defendant raises four issues on appeal:  (1) whether this court should waive his untimely notice of appeal in the interests of justice; (2) whether the trial court erred in denying his motion to suppress his statements to police; (3) whether the evidence was sufficient to sustain his convictions; and (4) whether the trial court erred in granting the State's motion in limine to suppress evidence that he initially denied any involvement in the crimes.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Jones, Shelby County Public Defender; Phyllis Aluko, Assistant Public Defender (on appeal); and William Robilio and Sanjeev Memula, Assistant Public Defenders (at trial), for the appellant, Cordaro Hughes.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert and Michelle Parks, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

This case arises out of the defendant's participation in an armed robbery that resulted in the death of one victim and the injury of a second. On May 14, 2004, the defendant went with Starbrough Jones and Cantrell Taylor to a tire shop in Memphis, where they robbed and shot two employees, Ricardo Guevara and Anthony Woodfork. The defendant and Jones were subsequently indicted for the first degree felony murder of Woodfork, the especially aggravated robbery of Guevara, and the attempted especially aggravated robbery of Woodfork. Jones's case was later severed from the defendant's, and on January 23, 2007, the defendant proceeded to trial on the charges.

## Motion to Suppress

Prior to trial, the defendant filed a motion to suppress his statements to police on the grounds that they were involuntary. The sole witness at the June 23, 2006, hearing on that motion was Sergeant William D. Merritt, the Memphis Police Department homicide detective who interviewed the defendant. Sergeant Merritt testified that he first met with the defendant, who was accompanied by his grandmother, Dorothy Hunt, on June 8, 2004, at juvenile court. He said he advised the defendant of his rights and the defendant signed the waiver of rights form, indicating that he wished to waive his rights and make a statement. In that statement, the defendant said he had gone to the tire shop with the intent to commit a robbery but had been in the vehicle when the robbery and homicide occurred.

Sergeant Merritt testified that he again interviewed the defendant on June 16, 2004, after receiving word that the defendant wanted to speak further with him. The second interview took place in a conference room at Youth Villages Treatment Center, where the defendant was staying, and was attended by five or six people, including Sergeant Merritt, the defendant, Sergeant Helldorfer of the Memphis Police Department, a staff member of Youth Villages, a woman who identified herself as the defendant's legal guardian, and the defendant's sister.[1] He read the defendant his rights, and the defendant once again signed the waiver of rights form before initially providing the same account of the crimes he had in his earlier statement. However, after he made him aware of information he had obtained from other witnesses, the defendant changed his version of events, stating that he had been armed with a weapon and had fired a shot that struck the Hispanic victim.

On cross-examination, Sergeant Merritt testified that it was a member of the defendant's family, possibly his grandmother, who telephoned to tell him that the defendant wanted to speak with him again about the case. He said he would not have gone to Youth Villages otherwise. He stated that the defendant's guardian, an aunt, met him at 201 Poplar and followed him to Youth Villages in her own vehicle. He was aware that the defendant was a juvenile and knew from the first interview that he had completed either the ninth or tenth grade in school. He was also aware that the defendant had threatened suicide at some point while he was at juvenile court. He said the staff

---

[1] In the tape-recording of the interview, the defendant identified his family members present as Angela Parker and Margaret Crockett, his aunt. Sergeant Merritt identified the Youth Villages staff member present at the interview as Austin O' Dell, a counselor.

members at Youth Villages informed him that the defendant had previously been on medication but was no longer taking anything at the time of the interview.

## **Trial**

Latoya Fleming, sister of Anthony Woodfork, the deceased victim, testified that her brother was twenty-six years old and working at "S & S Tires" at the time of his death.

Ricardo Guevara, testifying through an interpreter, said that in May 2004 he was working for his brother, Salvidore Guevara, who owned the S & S Tire Shop located at 3135 Summer Avenue in Memphis. At about 6:20 p.m. on May 14, 2004, a curly-haired man dressed in a short-sleeved t-shirt, whom he later referred to as Jones, came by the shop with the defendant to sell Woodfork some tennis shoes. The men left after speaking with Woodfork but returned later that day accompanied by a third man. Jones handed the shoes to Woodfork, who was seated in the driver's seat of his Honda automobile, and Guevara, who was seated in the passenger seat of the same vehicle, began to try them on. As he did so, the defendant approached and placed a gun to his temple through the open window. The defendant opened the car door and Guevara exited the vehicle, arms raised over his head. The defendant demanded Guevara's money and took his wallet, which contained his documents and $60 in cash. The defendant then took two steps backwards, shot Guevara in the side, and ran off.

Guevara testified that Jones, also armed with a gun, was struggling with Woodfork for his money during the time that the defendant was robbing Guevara. He said that Woodfork had placed his money in his mouth and that the struggle between the two men began while Woodfork was still in the vehicle but continued outside the vehicle after Woodfork got out. He stated that approximately one minute before the defendant shot him, he heard a gunshot as Woodfork was being shot.

Guevara testified that the bullet the defendant fired at him entered his body on the right side and traveled to the left side, where it remained lodged. He said he spent "[o]ne night and a day" in the hospital as a result of his injury. He made a positive courtroom identification of the defendant as the man who had shot him and agreed that he had also positively identified him in a juvenile court proceeding held a few months after the robbery.

On cross-examination, Guevara testified, in contrast to his direct examination testimony, that the defendant was not present when Jones first came to the shop to talk to Woodfork about the shoes. He also agreed that it was Jones, and not the defendant, who had the shoes when the men returned to the shop later that day. He acknowledged that, in his original statement, he told Sergeant Merritt that "[t]hey only took out my wallet, but they didn't take anything." He further acknowledged that he had described the defendant as being about five feet, seven inches to five feet, nine inches in height.

Memphis Police Officer Darrel Felton, the first officer to respond to the scene, testified that he arrived at approximately 8:42 p.m. to find a male Hispanic victim sitting behind the steering

wheel of a pickup truck and an unresponsive male African-American victim lying on his left side in front of one of the garage doors.

Memphis Police Officer Ricky Davison, assigned to the crime scene investigation unit, identified photographs he took of the crime scene, including one that showed cash lying on the ground outside the driver's door of Woodfork's Honda automobile.

Memphis Police Officer Jeffrey Burns, Sr. testified that on June 3, 2004, he and his partner were conducting off-duty security at the Red Oak Apartments in Memphis, where they had heard gunshots all night. As they were making their rounds through the apartments, they heard another gunshot and saw an African-American male, whom his partner recognized as Starbrough Jones, with something in his hand. Jones tucked the object in his waistband and fled, running up some stairs and jumping off the end of a building. Officer Burns and his partner tackled Jones when he hit the ground. In the process, a loaded black revolver fell out the bottom of Jones's pants leg.

Memphis Police Officer John Harper, who collected the weapon into evidence that night, identified the gun and the four live rounds and one spent round that it contained.

Dr. Feng Li, the medical examiner who performed the autopsy of Anthony Woodfork's body, testified that he determined that the manner of death was multiple gunshot wounds. He said there were three gunshot wounds to the victim's body: one to the left side of the back that damaged the left kidney, the lower lobe of the left lung, the interior aspect of the liver, and the middle lobe of the right lung; one to the right side of the back that damaged the lower lobe of the right lung, the right lobe of the liver and the head of the pancreas; and one to the right elbow. Dr. Li identified two bullets that he recovered from the victim's back and stomach.

Sergeant Paula Harris of the Memphis Police Department testified that she retrieved the two bullets from the morgue and tagged them into evidence on May 17, 2004. On June 9, 2004, she took those bullets, along with the four live rounds, spent shell, and handgun recovered in connection with Jones's arrest, to the Tennessee Bureau of Investigation ("TBI") laboratory for testing.

TBI Special Agent Robert Daniel Royse, an expert in firearms identification, testified that he determined that the bullet recovered from the victim's chest had been fired from the gun, a six-shot .38 special Colt revolver, but that the bullet recovered from the victim's stomach had been fired from a different weapon.

TBI Special Agent Qadriyyah Debnam, an expert in DNA analysis, testified that Sergeant Merritt submitted a pair of Nike Air Jordan tennis shoes and a saliva standard from Cantrell Taylor to the laboratory for analysis. Based on her analysis, she determined that the DNA profile obtained from the right shoe matched the DNA profile obtained from Taylor's saliva sample.

Sergeant William Merritt testified that after developing the defendant as a suspect in the case, he prepared a photo line-up with his picture, which he showed to the surviving victim, Guevara. Guevara was not, however, able to identify the defendant at that time. Sergeant Merritt described his June 16, 2004, interview with the defendant and identified the defendant's waiver of rights form

and his tape-recorded statement, which was admitted into evidence and played for the jury.  He said that the defendant told him that Cantrell Taylor supplied the tennis shoes the men used as bait in the robbery and was present in the robbers' vehicle when the robbery took place.  The defendant also told him that both he and Starbrough Jones were armed with .38 caliber revolvers, that he took $30 in cash from Guevara before shooting him, and that Jones was responsible for shooting Anthony Woodfork.  On cross-examination, Sergeant Merritt acknowledged that $30 in cash was found on the ground beside the driver's door of Woodfork's vehicle.  He said that he was not certain, but the cash may have eventually been turned over to Woodfork's wife.

The defendant elected not to testify and rested his case without presenting any proof.  Following deliberations, the jury convicted him of the counts charged in the indictment and the trial court sentenced him to life imprisonment on the murder count, entering the judgment on January 25, 2007.  At the March 9, 2007, sentencing hearing, the trial court imposed the State's recommended sentences of fifteen years at 100% for the especially aggravated robbery conviction and eight years at 30% for the attempted especially aggravated robbery conviction, with the sentences to be served concurrently to each other and concurrently to the defendant's life sentence.  On March 16, 2007, the defendant filed a motion for new trial, which the trial court overruled on April 4, 2007.  The defendant filed his notice of appeal on May 2, 2007.

## ANALYSIS

### I.  Timeliness of Notice of Appeal

As his first issue, the defendant argues that, in the event that this court should find that his notice of appeal was not timely with respect to his first degree murder conviction, for which he was sentenced on January 25, 2007, we should waive the untimely filing in the interests of justice.  The State points out that our supreme court has held that the time for filing a motion for new trial begins from the imposition of the last sentence in a case which results in multiple convictions, see State v. Bough, 152 S.W.3d 453, 461 (Tenn. 2004), and therefore argues that both the motion for new trial, filed within thirty days of the defendant's sentencing for the robbery convictions, and the notice of appeal, filed within thirty days of the trial court's overruling of that motion, were timely.  We agree with the State.

### II.  Suppression of Statements

The defendant next contends that the trial court erred in denying his motion to suppress his statements. Citing, among other things, his youth, history of mental problems, and lack of education, the defendant argues that his statements were not freely, knowingly, and voluntarily made. The State argues that the evidence does not preponderate against the trial court's finding that the defendant voluntarily made the statements after being appropriately advised of his constitutional rights.  We agree with the State.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d

18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In Miranda v. Arizona, 384 U.S. 436, 471-75, 86 S. Ct. 1602, 1626-28 (1966), the United States Supreme Court held that a defendant's statements made during a custodial interrogation are inadmissible at trial unless the State establishes that the defendant was informed of his right to remain silent and his right to counsel and that he knowingly and voluntarily waived those rights. Whether the defendant made a voluntary, knowing, and intelligent waiver of those rights depends "'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" Edwards v. Arizona, 451 U.S. 477, 482, 101 S. Ct. 1880, 1884 (1981) (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S. Ct. 1019, 1023 (1938)).

Tennessee courts use the federal "totality-of-the-circumstances test" to determine whether a defendant has knowingly, intelligently, and voluntarily waived his Miranda rights. State v. Callahan, 979 S.W.2d 577, 581-82 (Tenn. 1998). When analyzing the waiver of a juvenile under the totality-of-the-circumstances test, the following factors should be considered:

> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;
>
> (4) any intoxication;
>
> (5) any mental disease, disorder, or retardation; and
>
> (6) the presence of a parent, guardian, or interested adult.

Id. at 583.

Here, the defendant, who was seventeen years old at the time, was advised of his Miranda rights before both interrogations and signed a written waiver of those rights before each statement. The defendant's grandmother was present during the interrogation that took place at juvenile court, and the defendant's aunt and a Youth Villages counselor were present during the subsequent interrogation, initiated by the defendant, which took place at Youth Villages Treatment Center. The

defendant had completed the ninth grade of high school and, according to the Youth Villages staffers, was not on medication at the time he gave his statements. Sergeant Merritt's manner during the second tape-recorded statement was calm and matter-of-fact, as was the defendant's. In sum, the record fully supports the trial court's finding that the defendant made his statements knowingly, intelligently, and voluntarily. Accordingly, we affirm the denial of the defendant's motion to suppress his statements.

### III. Sufficiency of the Evidence

The defendant next contends that the evidence was insufficient to sustain his convictions. He argues that the evidence was insufficient to support his convictions for felony murder and attempted especially aggravated robbery because there was insufficient proof that he attempted to take anything from Woodfork or that his actions caused his death. He further argues that there was insufficient evidence to sustain his especially aggravated robbery conviction because the State failed to present any credible evidence that anything of value was taken from Guevara.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree felony murder for killing Woodfork during the perpetration of a robbery, of the especially aggravated robbery of Guevara, and of the attempted especially aggravated robbery of Woodfork. First degree felony murder is "[a] killing of another

committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (2006). The mental state required for conviction of felony murder is the intent to commit the underlying offense. Id. § 39-13-202(b).

Especially aggravated robbery is robbery that is accomplished with a deadly weapon and where the victim suffers serious bodily injury. Id. § 39-13-403(a). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. 39-13-401(a).

A person commits criminal attempt when the person, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a).

Finally, "[a] person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. 39-11-402(2).

We conclude that the evidence, viewed in the light most favorable to the State, was sufficient to sustain all three convictions. The State presented proof to establish that the defendant, Jones, and Taylor formulated a plan to rob the victims using the tennis shoes as bait for the robbery. When the victims were distracted with the shoes, Jones, who was armed with a .38 caliber handgun, began struggling to take Woodfork's money from him while at the same time the defendant, armed with a similar weapon, was demanding and taking Guevara's wallet. The defendant then shot Guevara in the side, causing him to suffer serious bodily injury, while Jones shot Woodfork, causing his death.

In support of his argument that no actual robbery occurred, the defendant relies on Guevara's written statement to police in which he indicated that nothing was taken from his wallet. In his direct examination testimony, however, Guevara testified that the defendant demanded money and

-8-

then took his wallet, which contained his documents and $60 in cash. The jury obviously resolved any discrepancies in the evidence in the favor of the State, as was within its province as the trier of fact. See Pappas, 754 S.W.2d at 623. We also note that some discrepancies between the written statement and Guevara's trial testimony may have been occasioned by the fact that the statement was written in English, presumably by the interviewing officer. At trial, the court interpreter had to interpret the statement into Spanish for the non-English speaking Guevara to understand and then translate his answers into English. In sum, there was sufficient evidence to sustain the defendant's convictions for the felony murder and attempted especially aggravated robbery of Woodfork and the especially aggravated robbery of Guevara.

### IV. Grant of State's Motion in Limine to Exclude Evidence

As his final issue, the defendant contends that the trial court committed an abuse of discretion and plain error when it granted the State's motion in limine to exclude evidence that he initially denied his involvement in the crimes. Specifically, the defendant argues that not being allowed to present evidence to the jury that he initially provided an alibi to police and then later, when the alibi did not check out, told police that he was present in the vehicle but did not participate in the crimes, "adversely affected his constitutional rights to due process and to a jury trial." He further argues that all five factors establishing plain error are satisfied in the case. The State disagrees, arguing that the defendant has not shown that the trial court's decision in this respect constitutes plain error.

The defendant did not raise this issue in his motion for new trial. However, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. Crim. P. 52(b). In order for us to find plain error, "'(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

We agree with the State that the prerequisites for a finding of plain error are not satisfied in this case. The defendant asserts that his initial disavowals of involvement in the crimes constituted relevant admissible evidence and that a clear and unequivocal rule of law was therefore breached by its exclusion. We respectfully disagree. The decision to admit or exclude evidence generally lies within the sound discretion of the trial court. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999). In a pretrial hearing, the State argued that the oral statements by the defendant, which were made prior to the time of his taped confession, were self-serving and inadmissible hearsay. The trial court agreed and therefore granted the State's motion in limine, as was within its discretion.

### CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE